**STATE of Utah, Plaintiff and Respondent,**

v.

**Bruce Alan BENSON, Defendant and Appellant.**

**No. 19539.**

Supreme Court of Utah.

Dec. 23, 1985.

Gary H. Weight, Provo, for defendant and appellant.

David L. Wilkinson, Atty. Gen., and Earl F. Dorius, Salt Lake City, for plaintiff and respondent.

HOWE, Justice:

Defendant Benson appeals from a conviction of manslaughter, U.C.A., 1953, § 76–5–205, for recklessly causing the death of his four-month-old son, Michael.

Michael seemed in good health at 10:00 p.m. on Saturday, May 14, 1983, when Benson's sister, Susan, left his apartment to return to her own apartment in the same complex. Benson's wife, Sarah, returned from work at 11:00 p.m., at which time the child was in his crib, presumably asleep. Benson informed his wife at 6:00 the next morning that the baby "had passed away." When the couple arrived at the Utah Valley Hospital emergency room with Michael at about 7:00 a.m., his body was cold and rigid. A physician pronounced him dead upon arrival. An autopsy revealed that death was caused by a subdural hematoma accompanied by multiple contusions of the body, including neck injuries resulting from choking that could have been sufficient to kill a four-month-old child. The medical examiner concluded that the autopsy findings were inconsistent with accidental death and consistent with battered child syndrome and homicide. The child's death was estimated to have occurred between six to eight hours prior to the time he

arrived at the hospital and between twelve to thirty-six hours prior to the autopsy performed at 11:00 a.m. of that day.

Benson and his wife were separately interrogated by the Provo City Police regarding the death of their child. Both were told that they were not under arrest, that they were free to leave, and that no charges would be filed for the time being. Detective Adamson conducted a preliminary interview with Benson to obtain background information on his child, after which he consulted with Detective Teuscher, who had interviewed Sarah Benson. Adamson then returned to read Benson his rights and to obtain a waiver and a written statement from him. A second interview between Adamson and Benson was held the following day, Benson again receiving his Miranda warnings and signing a waiver. During the preliminary interview, Benson had told Adamson that the child had fallen from the kitchen counter. However, after signing the waiver, he admitted choking the baby occasionally over a two-week period to stop his crying. In this second interview, Benson told Adamson that the baby would not stop crying the night before his death after falling from the kitchen counter and that he banged the baby's head against his chest repeatedly until the baby stopped crying. He then put the child to bed.

## I

Benson contends that the trial court committed reversible error by compelling his wife to testify as a witness against him in violation of the Utah Constitution, article I, section 12, and U.C.A., 1953, §§ 77–1–6(2)(d) and 78–24–8(1). These provisions embody different marital privileges. Article I, section 12 endows a witness spouse with the absolute right to a testimonial privilege. "A wife shall not be compelled to testify against her husband, nor a husband against his wife." That language is codified verbatim in section 77–1–6(2)(d) of the Code of Criminal Procedure. Additionally, section 78–24–8(1) of the Judicial Code contains two marital privileges. First, an accused spouse is granted the privilege to prevent his or her spouse from testifying. The second privilege, the communication privilege, prevents a spouse from being examined as to any communications made by one to the other during the marriage. The pertinent part of that statute provides:

> A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either during the marriage or afterwards be, without the consent of the other, examined as to any communications made by one to the other during the marriage; but this exception does not apply ... to a criminal action or proceeding for a crime committed by one against the other, ... nor where it is otherwise specially provided by law.

▇▇▇ It is to be noted that the statute makes the two privileges enumerated therein inapplicable "where it is otherwise specially provided by law." We held in *State v. Bundy*, Utah, 684 P.2d 58 (1984), that Rule 23(2) of the Utah Rules of Evidence, which was in force at the time of defendant's trial, modified section 78–24–8(1) by limiting the privilege solely to confidential communications. In the instant case, no testimony was elicited on any communication between Mr. and Mrs. Benson. However, even if there had been such testimony, Rule 23(2) makes the privilege as to confidential communications inapplicable in actions in which the accused is charged with a crime against the child of either spouse. Therefore, it is clear that the privileges provided for in section 78–24–8(1), as they have been modified by Rule 23(2), avail defendant nothing.[1]

▇▇▇▇ Article I, section 12 of our state constitution and section 77–1–6(2)(d) provide that neither husband nor wife shall be compelled to testify against the other. The record leaves doubt as to whether Sarah Benson was willing to testify for the State. When she was called to testify, her hus-

---

**1.** New Rules of Evidence took effect September 1, 1983, which might produce a different result.

band's counsel stated to the court that she "resists testifying at this juncture." The trial court overruled the objection on the ground that she did not have a privilege to refuse to testify. She thereupon testified for the State, characterizing her husband as a caring and loving father to his son. While the basis for the trial court's ruling was in error, the ruling was technically proper since Mrs. Benson did not either personally or through her counsel claim the privilege against testifying. (She was not represented by counsel.) Even if we were to concede that she could claim her privilege through her husband's counsel, any error by the court in failing to accord her that privilege was harmless. Error is to be disregarded if it does not affect the substantial rights of the defendant. Utah R.Crim. P. 30.

Benson claims that without his wife's account of her activities during the crucial period before the baby's death, there is no evidence that he had the exclusive care of the child. That claim has no merit. Benson produced as a witness his sister, who testified that she was with him and the child for the greater part of the period during which Sarah Benson was at work and that she left their apartment about an hour before Sarah Benson returned from work. Thus, the only testimony that placed Benson in the exclusive care of his son for one hour was not that of his wife. In short, assuming that it was error to compel Sarah Benson to testify, that error was not substantial and prejudicial in the sense that there is a reasonable likelihood that in its absence there would have been a different result. *State v. Tucker*, Utah, (1985), and authorities cited therein. Nothing in defendant's wife's testimony pointed to his guilt. No element of the crime was proved or even corroborated by any of her testimony. Nothing she said affected his substantial rights.

■ Benson's second point on appeal, that the court committed error in admitting testimony of Benson's statements before he was advised of his Miranda rights, is also without merit. Benson voluntarily went to the police station. He was informed by Detective Adamson that he was not under arrest, that no charges were being filed at that time, and that he was free to leave at any time. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), procedural safeguards were established to protect a defendant's privilege against self-incrimination while in custody or otherwise deprived of his freedom by the authorities in a significant way. That protection has not been expanded to cover interrogation in noncustodial circumstances merely because the police investigation has concentrated upon the individual being questioned. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Benson made no incriminating statements, but gave background information to the detective on personal data and volunteered an innocent explanation of one of the child's prior injuries not contributing to his death. No prejudice resulted from the admission of those statements.

### III

■ In his last point on appeal, Benson assigns as error the court's permitting the prosecution to pursue a whole line of questioning regarding the bruises on the child's throat, which was not touched by Benson's testimony in chief. He elected to take the stand and volunteered explanations on direct examination about several purported accidents causing the child's varied injuries. Broad discretion is allowed in cross-examination of a defendant who has opened a subject on direct examination. *State v. Jarrell*, Utah, 608 P.2d 218 (1980). Furthermore, to the extent that cross-examination went beyond direct examination, it was conducted to impeach Benson's credibility. Statements he had made on direct examination conflicted with previous statements given to the detectives. When the accused takes the stand, he opens himself to cross-examination like any other witness. *State v. Mora*, Utah, 558 P.2d 1335 (1977). That includes cross-examination on matters

that would tend to contradict, explain, or cast doubt upon the credibility of his testimony. *State v. Green,* Utah, 578 P.2d 512 (1978).

The judgment and conviction are affirmed.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.