STATE of Utah, Plaintiff and Appellee,

v.

Jerry Lee ROBERTSON, Defendant
and Appellant.

No. 940374.

Supreme Court of Utah.

Feb. 18, 1997.

Jan Graham, Att'y Gen., Marian Decker, Asst. Att'y Gen., Howard Lemke, Salt Lake City, for plaintiff.

Mary C. Corporon, Kellie F. Williams, Salt Lake City, for defendant.

ZIMMERMAN, Chief Justice:

Jerry Lee Robertson appeals his 1994 jury conviction for murder and theft and the trial court's subsequent imposition of restitution costs totaling approximately $60,000. Robertson claims that the trial court made numerous errors during his trial, including (i) finding him competent to proceed to trial without making adequate findings of fact; (ii) failing to hold a hearing on the issue of competency; (iii) failing to stay all proceedings against him subsequent to the filing of a petition for inquiry into competency; (iv) admitting his former wife's testimony against him; (v) failing to grant a mistrial following allegedly prejudicial statements made in the jury's presence; (vi) failing to give the jury his proposed reasonable doubt instruction and failing to instruct the jury on the theory of reasonable alternative hypothesis; and (vii) abusing its discretion in ordering restitution costs. We have jurisdiction to hear Robertson's claims because this case is an appeal from a "district court involving a conviction of a first degree ... felony." Utah Code Ann. § 78–2–2(3)(i). We affirm the conviction but remand for further proceedings regarding restitution of extradition costs.

In late October of 1991, Robertson and his wife, Cassie, were living on the streets in Salt Lake City, Utah, when they met Gerald Thomas at the Salvation Army. Thomas offered to let Robertson and Cassie stay with him in his apartment for a few days. They stayed with Thomas for approximately five days. On the last day, Robertson and Thomas began to argue. While Thomas was in the bathroom, Robertson told Cassie that he was going to "take him out." After Thomas went to bed, Robertson told Cassie to knock Thomas out by hitting him in the head with a hammer. Cassie located a claw hammer in Thomas's apartment while Robertson went through Thomas's wallet. While Thomas slept, Cassie struck Thomas once in the left side of his head with the hammer. Thomas immediately sat up and exclaimed, "Oh God!" Robertson took the hammer from Cassie and struck Thomas in the head approximately eleven times. Thomas died as a result of the hammer blows to his head.

Both Robertson and Cassie were apprehended in Fresno, California, for Thomas's murder. They were subsequently extradited to Utah. Cassie, who pleaded guilty to murder, was serving a five-to-life prison term at the time of Robertson's trial. Robertson and Cassie were divorced on September 14, 1992.

On June 8, 1992, Robertson filed a competency petition claiming that he was not competent to stand trial. The trial court appointed Drs. Linda Gummow and Vickie Gregory to examine Robertson. Both examiners concluded that Robertson was incompetent to stand trial. The State stipulated to the examiners' findings, and the trial court committed Robertson to the Utah State Hospital on June 26, 1992. The court ordered the State Hospital to provide documentation regarding Robertson's progress toward competency.

On April 23, 1993, a State Hospital administrator sent a letter to the trial court indicating that Robertson was competent to stand trial. The court had also received reports from State Hospital doctors indicating that Robertson was malingering. Pursuant to this information, the State moved to have Robertson transported from the State Hospital to the county jail to await further proceedings.

The trial court held several evidentiary hearings on the issue of Robertson's malingering. After considering the evidence, the court determined that Robertson was "feigning" his symptoms. The commitment order was vacated. Having vacated the commitment order, the court determined that a "state of equipoise" then existed regarding Robertson's competence to proceed. The court then proceeded "as if" the commitment order "had never been forthcoming." Robertson had the right and opportunity to raise the issue of competency again, but the court noted that he had the burden of proof.

Represented by new counsel, Robertson filed a second competency petition on March 3, 1994. The trial court denied the petition, finding that Robertson's promise of future cooperation with mental health experts was

not credible. The court did, however, permit a further mental evaluation to be conducted, on condition that the evaluation not delay the trial and that the parties stipulate to the evaluator. The parties stipulated to the appointment of Dr. Louis Moench. Dr. Moench examined Robertson and concluded that he was feigning incompetency.

On another front, Robertson made a pretrial motion to exclude from the forthcoming trial all testimony of his former wife, Cassie. The court denied Robertson's motion. During trial, Cassie made a statement that could be construed as referring to Robertson's "acting" crazy. Robertson moved for a new trial, arguing that the statements had tainted the jury. The trial court concluded that the ambiguous remark did not taint the jury and denied the motion.

Following a four-day trial, Robertson was convicted of murder and theft. The court imposed a term of five years to life for murder and one to fifteen years for theft. Additionally, the court imposed approximately $60,000 in restitution costs on Robertson to cover the expenses incident to extradition and housing Robertson at the State Hospital during his period of malingering.

Robertson claims that the trial court erred by (i) finding him competent to proceed to trial without making adequate findings of fact; (ii) failing to hold a hearing on the issue of competency; (iii) failing to stay all proceedings against him subsequent to the filing of a petition for inquiry into competency; (iv) admitting his former wife's testimony against him; (v) failing to grant a mistrial following allegedly prejudicial statements made in the jury's presence; (vi) failing to give the jury his proposed reasonable doubt instruction and failing to instruct the jury on the theory of reasonable alternative hypothesis; and (vii) abusing its discretion in ordering restitu-

tion costs. We will address these claims seriatim.

Regarding the handling of his petition for inquiry into his competency, Robertson raises three claims of error. His three claims can be addressed under two headings: first, that the trial court erred substantively when it concluded that he was competent and, second, that the court failed to follow the correct procedures in that it did not hold a proper hearing on the issue of competency and it refused to stay all proceedings against him subsequent to the filing of his petition.

On the merits of the competency issue, under section 77–15–2 of the Code,[1] the trial court must determine whether an accused has the ability to understand the nature of the proceedings and the potential punishment and has the ability to assist counsel in his or her defense.[2] Robertson essentially argues that the court arbitrarily rejected the analyses and conclusions of the two court-appointed examiners who testified that he was incompetent in favor of the other witnesses who claimed he was feigning.

The determination of whether a defendant is competent to proceed to trial is a mixed question of fact and law. *State v. Lafferty*, 749 P.2d 1239, 1243 (Utah 1988). The trial court's factual findings in support of its determination of malingering and its accompanying credibility determinations are subject to a clearly erroneous standard of review. Utah R.Civ.P. 52(a); *Lafferty*, 749 P.2d at 1244. The proper interpretation of the statutory standard for competency is a question of law. *Lafferty*, 749 P.2d at 1243. Before this court, Robertson essentially challenges the trial court's findings of fact. Therefore, Robertson bears the burden of marshaling all the evidence in favor of the factual finding that he was malingering and then demonstrating that, even viewing the evidence in the light most favorable to the

---

1. Section 77–15–2 of the Code states:

 For the purposes of this chapter, a person is incompetent to proceed if he is suffering from a mental disorder or mental retardation resulting either in:

 (1) his inability to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged; or

 (2) his inability to consult with his counsel and to participate in the proceedings against him with a reasonable degree of rational understanding.

2. This determination is mandated by section 77–15–1 of the Code, which provides, "No person who is incompetent to proceed shall be tried or punished for a public offense."

court below, that evidence is insufficient to support the court's finding. *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991) (per curiam).

The court-appointed doctors who performed the competency evaluations on Robertson acknowledged that patient cooperation was very important in diagnosing competency and that without cooperation any test result was questionable. Dr. Gummow stated that the tests she administered required Robertson's complete honesty and that she would not have picked up on a consistent lie from Robertson. In fact, Dr. Gummow conceded that Robertson's reluctance to talk about the murder could be attributed to choice rather than to inability. Dr. Gregory also acknowledged that the validity of all testing hinged on Robertson's honesty and that there was a possibility that he had not been entirely honest with her. Thus, by their own testimony, if Robertson had been consistently dishonest with Drs. Gummow and Gregory, their determination that Robertson was incompetent is unreliable.

■ The record reveals ample evidence supporting the trial court's determination of malingering. One of the primary symptoms of mental incompetency relied upon by Drs. Gregory and Gummow was Robertson's inability to express or understand verbal communications. The record is replete with evidence of faking on this point. The Salt Lake City Police Department detective who escorted Robertson from Fresno, California, to Salt Lake City testified that Robertson laughed and joked during the trip, exhibiting no signs of speaking difficulties. Likewise, a registered nurse at the State Hospital testified that Robertson showed markedly different speaking ability, depending upon whether he was being formally observed or merely dealing with staff. A clinical worker from the State Hospital made similar observations. Indeed, this clinical worker overheard Robertson talking on the phone with his lawyers using monosyllabic responses and a dragging speech pattern, only to revert back to a livelier speech pattern when the call ended. The clinical worker testified that when she confronted Robertson, he responded by stating that his lawyers "knew that this was an act."

The trial court also heard evidence from other doctors who had observed Robertson. Dr. Bert Cundick evaluated Robertson with multiple I.Q. tests. Robertson's results on these tests varied dramatically. Dr. Cundick attributed this discrepancy to Robertson's uncooperative and faking behavior. Dr. Cundick therefore concluded that Robertson was malingering and was competent to stand trial. Additionally, Drs. Gerald Berge, Robert Howell, and Anthony Gillette all testified to observing behavior that led them to conclude that Robertson was feigning incompetency. Finally, on the basis of its own observations and Robertson's responses to in-court questioning, the trial court found that Robertson had malingered and would continue to feign incompetency. From the foregoing, we cannot conclude that the trial court's determination that Robertson was feigning incompetency was clearly erroneous.

The court did not, however, enter a finding that Robertson was competent. Robertson asserts that this omission necessitates a reversal of his conviction. Robertson argues that section 77–15–2 of the Code, which defines the legal standard of competency, requires the court to enter specific findings regarding whether he is competent. We reject this argument.

■ Under our decision in *State v. Ramirez,* when "factual issues are presented to and must be resolved by the trial court but no findings of fact appear in the record, we 'assume that the trier of [the] facts found them in accord with its decision, and we affirm the decision if from the evidence it would be reasonable to find facts to support it.'" 817 P.2d 774, 787 (Utah 1991) (quoting *Mower v. McCarthy,* 122 Utah 1, 245 P.2d 224, 226 (1952)) (additional citations omitted). However, there are instances in which the application of the *Ramirez* assumption would be inappropriate. For instance, in *Ramirez* itself we said, "If the ambiguity of the facts makes this assumption unreasonable, ... we will remand for a new trial." *Id.* at 788 (citations omitted). In addition, if a governing statute explicitly provides that the trial court must make written findings of fact

regarding a particular matter, then the court's failure to make these findings may constitute error, even if it would be reasonable to conclude that the judge intended to make them. *State v. Labrum,* 925 P.2d 937, 939–40 (Utah 1996). Moreover, if this court has previously determined that the trial court must make written findings on an issue to assure that the materiality of the question is impressed on the trial judge so as to enable this court to perform properly its appellate review function, then we will not assume that the court made the findings. *See, e.g., State v. Eldredge,* 773 P.2d 29, 34 (Utah) (requiring trial court to enter findings and conclusions regarding admission of hearsay testimony of child victims in sex abuse cases), *cert. denied sub nom. Eldredge v. Utah,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *State v. Nelson,* 725 P.2d 1353, 1355–56 n. 3 (Utah 1986) (same). We do not face any of these situations here.

The sections relied upon by Robertson in support of his argument that the court erred by failing to make findings regarding his competency do not contain an explicit legislative directive to make written findings. Section 77–15–2 of the Code merely defines incompetency in simple terms; it makes no reference whatsoever to a duty of the trial court to make any written findings on the issue. Section 77–15–6 [3] provides the procedures to be followed if a defendant is found incompetent. Section 77–15–6(1) states:

> [I]f after hearing, the person is found to be incompetent, the court shall order him committed to the Utah State Hospital or to another mental health facility until the court that committed him or the district court of the county where he is confined, after notice and hearing, finds that he is competent to proceed.

This section likewise does not require the trial court to make specific written findings of fact. The statutes relied upon by Robertson, thus, unlike the statute in *Labrum,* do not require written findings concerning the various definitional aspects of incompetency found in section 77–15–2. Furthermore, no prior case has mandated that a trial court make written findings on this issue. Therefore, we now proceed to determine whether the facts of this case support the *Ramirez* assumption that the trial court found that Robertson was competent.

The trial court explicitly determined that Robertson was feigning incapacity to comprehend and communicate. Because Drs. Gummow and Gregory had found Robertson incompetent on the basis of his inability to comprehend and communicate, the court determined that their findings of incompetency were in error. The court therefore vacated its commitment order, which had been based solely on their evaluations of Robertson. When Robertson again raised the issue of competency, the trial court denied his petition, which did not allege any facts of incompetency that the court had not already determined to be a product of Robertson's feigning. Having found that Robertson's claim of incompetency was not credible, the court proceeded with the trial. Implicit in the court's decision to proceed with the trial after it determined that Robertson was merely feigning his "symptoms" of incompetency is a determination that Robertson was competent. Indeed, that the court actually made this implicit finding of competency is strongly supported by the court's comments on the jury's verdict at the sentencing hearing. The court stated that "because of the alternatives that [the jury] rejected in terms of guilty and mentally ill, . . . their view is consistent with *my view, and that is, that*

---

**3.** This section was amended in 1994, effective May 2, 1994. Incompetent Defendants Amendments, ch. 162, § 5, 1994 Utah Laws 728–30. This amendment substantially rewrote the procedures to be followed after a defendant has been found incompetent. The current version of section 77–15–6 provides in pertinent part:

> (4) [T]he court shall hold a hearing to determine the defendant's current status. At the hearing, the burden of proving that the defendant is competent is on the proponent of com-

petency. Following the hearing, the court shall determine by a preponderance of evidence whether the defendant is:

> (a) competent to stand trial;

> . . . .

> (5) (a) If the court enters a finding pursuant to Subsection (4)(a), the court shall proceed with the trial or such other procedures as may be necessary to adjudicate the charges.

All subsequent citations are to section 77–15–6 as it stood prior to the 1994 amendment.

*the defendant was competent to proceed"* (emphasis added).

■ Here, the trial court explicitly considered and rejected all of Robertson's contentions that he was incompetent to proceed, and because the record is entirely consistent with a finding of competency, we can safely apply the *Ramirez* assumption and conclude that the court found Robertson competent. We therefore uphold the trial court's decision to proceed with the trial.

Robertson next claims that the trial court failed to follow the correct procedures in dealing with his second competency petition. Specifically, Robertson argues first that the trial court did not hold the hearing required by section 77–15–5(1) of the Code and second that it did not stay all proceedings pending the disposition of the petition, as required by section 77–15–5(6).[4] Section 77–15–5(1) provides, "When a petition is filed pursuant to Section 77–15–3, the court shall enter an order for a hearing on the mental condition of the person who is the subject of the petition." Section 77–15–5(6) states, "All other proceedings pending against the defendant shall be stayed until the proceedings to determine his mental condition are terminated."

■ Responding to the first argument, we note that section 77–15–5(1) directs that if a petition asserting a lack of competency "is filed pursuant to Section 77–15–3, the court shall enter an order for a hearing on the mental condition of the person who is the subject of the petition." This statute is written in mandatory rather than permissive language, as it states that "the court *shall* enter

an order for a hearing." Utah Code Ann. § 77–15–5(1) (emphasis added). The trial court satisfied this hearing requirement by holding a hearing on March 17, 1994, to consider Robertson's second competency petition. On appeal, Robertson has failed to make the transcript of the March 17 hearing part of the record. Thus, we cannot determine whether the court complied with the requirement of section 77–15–5(5) that "[t]he hearing ... be conducted according to the procedures outlined in Subsections 62A–12–234(9)(b) through (9)(f)." As we stated in *Jolivet v. Cook,* " 'If an appellant fails to provide an adequate record on appeal, this Court must assume the regularity of the proceedings below.' " 784 P.2d 1148, 1150 (Utah 1989) (quoting *State v. Miller,* 718 P.2d 403, 405 (Utah 1986)), *cert. denied sub nom. Jolivet v. Barnes,* 493 U.S. 1033, 110 S.Ct. 751, 107 L.Ed.2d 767 (1990). Therefore, we reject Robertson's argument that the court erred by failing to hold a hearing.

Robertson's second procedural attack on the trial court's handling of his second petition concerns the court's failure to enter a formal stay while the petition was pending, as required by section 77–15–5(6) of the Code. That section provides, "All other proceedings pending against the defendant shall be stayed until the proceedings to determine his mental condition are terminated." Utah Code Ann. § 77–15–5(6). Here, the trial court did not enter such a stay. Rather, the court scheduled hearings on additional motions and set the date for the jury trial. We agree that in so acting, the court failed to follow the statute.

4. Robertson's arguments concerning the trial court's failure to hold a hearing or stay the proceedings are based on the current version of section 77–15–5. This section, however, was amended in 1994, and the amendment became effective May 2, 1994. Incompetent Defendants Amendments ch. 162, § 4, 1994 Utah Laws 726–28. This amendment modified the provisions dealing with the hearing and stay requirements. Section 77–15–5 now provides in relevant part:

(1) When a petition is filed pursuant to Section 77–15–3 raising the issue of the defendant's competency to stand trial ..., *the court in which proceedings are pending shall stay all proceedings.* ... The district court in which the petition is filed shall pass upon the suffi-

ciency of the allegations of incompetency. If a petition is opposed by either party, the court shall, prior to granting or denying the petition, hold a limited hearing solely for the purpose of determining the sufficiency of the petition. *If the court finds that the allegations of incompetency raise a bona fide doubt as to the defendant's competency to stand trial, it shall enter an order for a hearing* on the mental condition of the person who is the subject of the petition. Utah Code Ann. § 77–15–5 (emphasis added). As this version did not become effective until after the trial court's dismissal of Robertson's second petition on March 17, 1994, our analysis and all subsequent citations are to section 77–15–5 as it stood prior to the 1994 amendment.

However, having determined that error was committed, we must address its harmfulness. An erroneous decision by a trial court "cannot result in reversible error unless the error is harmful." *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992). Harmless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings. *Id.* Put differently, an error is harmful only if the likelihood of a different outcome is sufficiently high that it undermines our confidence in the verdict. *Id.* The burden of showing harmfulness normally rests with the complaining party. *See Ashton v. Ashton*, 733 P.2d 147 (Utah 1987) (citing *Redevelopment Agency v. Mitsui Inv., Inc.*, 522 P.2d 1370, 1374 & n. 12 (Utah 1974)); *see also State v. Bishop*, 753 P.2d 439, 448 (Utah 1988) (holding that "appellant has the burden of establishing that reversible error resulted from an abuse of discretion"). Robertson has failed to carry this burden.

Robertson filed his second competency petition on March 3, 1994. On March 17, the trial court denied the petition. Robertson argues that the prejudice he suffered from the lack of a stay during this two-week period is clear. However, the only prejudice he claims is that he was in fact incompetent to proceed to trial during this period (and afterward). We have already affirmed the trial court's rejection of this claim and the denial of the petition; therefore, we find no reason for concluding that the jury's verdict might have differed on the ultimate question of guilt had the trial judge formally stayed all proceedings for two weeks, as required by the statute.[5] Because we find the trial court's error to have been harmless, we reject this leg of Robertson's challenge to his conviction.

We now consider Robertson's claim of error regarding the admission of Cassie Robertson's testimony against him during trial. Robertson argues that the trial court erred in allowing his former wife, Cassie Robertson, to testify against him. Before trial, Robertson moved to exclude Cassie's testimony. His motion was based on article I, section 12 of the Utah Constitution, which prevents the State from compelling a husband or wife to testify against his or her spouse, and section 78–24–8(1) of the Code, which under most circumstances requires the consent of one spouse to permit the examination of the other regarding any communication made by one to the other during marriage. The court denied the motion on the grounds that the privilege under the constitution belonged solely to the witness spouse and that section 78–24–8(1) was inapplicable.

Before this court, Robertson argues that the marital privileges recognized by Utah law may be asserted by either the accused spouse or the testifying spouse. Robertson relies on article I, section 12 of the Utah Constitution and rule 502(a) of the Utah Rules of Evidence, the provisions recognizing a marital testimonial privilege, and section 78–24–8(1) of the Code and rule 502(b) of the Utah Rules of Evidence, which recognize marital communication privileges. To simplify our analysis, we will discuss these provisions according to the type of privilege the provisions recognize.

We begin with the provisions granting a marital testimonial privilege. Marital testimonial privileges permit a husband or wife to refuse to testify in court about any matter against his or her spouse. The traditional justifications for this privilege have been the prevention of marital dissension and the "natural repugnance in every fair-minded person to compelling a wife or husband to be the means of the other's condemnation." 8 John H. Wigmore, *Evidence in Trials at Common Law* § 2228 (McNaughton rev. 1961). If a husband or wife could be compelled to testify against his or her spouse, the testifying spouse would be placed in the unenviable position of either committing perjury or testifying to matters that are detrimental to his or her spouse, which could clearly lead to marital strife. Marital testimonial privileges avoid this moral hazard by permitting a spouse to refuse to testify.

---

5. Although Robertson has not proven that he was prejudiced by this error, we nevertheless stress the importance of following the statutory requirements for determining competency to stand trial.

The testimonial privileges found in article I, section 12 and rule 502(a) are identical. The rule merely repeats verbatim the constitutional provision. That provision states that "a wife shall not be *compelled* to testify against her husband, nor a husband against his wife." Utah Const. art. I, § 12 (emphasis added); *see also* Utah R. Evid. 502(a).

 We use our general rules of statutory construction to interpret these provisions. "Where statutory language is plain and unambiguous, this Court will not look beyond to divine legislative intent." *E.g., Allisen v. American Legion Post No. 134,* 763 P.2d 806, 809 (Utah 1988). "Instead, we are guided by the rule that a statute should be construed according to its plain language." *Id.* The quoted language from article I, section 12 and rule 502(a) is clear and unambiguous on its face that the marital privilege is to be invoked, if at all, only by the spouse *whom the state seeks to compel to testify.* This interpretation is confirmed by the advisory committee note to rule 502 of the Utah Rules of Evidence, which states, "Absent constitutional change, the rule repeats the state constitutional testimonial privilege for criminal cases in subparagraph (a), to be asserted or waived by the *witness spouse.*" Utah R. Evid. 502 advisory committee's note (emphasis added). Cassie was neither compelled to testify nor married to Robertson at the time she testified against him.

 Robertson attempts to avoid the plain reading of the constitutional language by arguing that the provision must be interpreted in light of the words "[r]ights of the accused" contained in the title to article I, section 12 of the Utah Constitution. He contends that this statement of purpose requires that we hold that the defendant "accused" spouse has the right to assert a testimonial privilege on behalf of his former wife who voluntarily testified. This argument is wholly without merit. While it is true that this court may look to the title of legislation to clarify the meaning of ambiguous language, the title cannot be used "to contradict or defeat a plainly expressed intent" or "to create an ambiguity or uncertainty when the language of the body of the act is clear." *Great Salt Lake Auth. v. Island Ranching*

*Co.,* 18 Utah 2d 45, 414 P.2d 963, 964–65 (1966). As we noted above, the explicit text of article I, section 12 deals only with *compelled* testimony of one spouse against the other. Because the language of article I, section 12 is plain and unambiguous, this court will not rely on the title of this provision to try to create an ambiguity.

Robertson has a further argument that rule 502(a) gives him the right to prevent Cassie from testifying. While the language of rule 502(a) is identical with the constitution and is, therefore, silent on whether the privilege may be claimed by the one called to testify, rule 502(b) states that either spouse may claim the quite different marital communications privilege described there. Robertson argues that we should construe rule 502(a) in light of rule 502(b)'s express bestowal on both spouses of the right to claim the marital communications privilege. We reject this argument. As we note below, the privileges described in rule 502(a) and (b) are entirely different in concept and origin. There is no basis for thinking that the drafters intended to expand rule 502(a)'s scope beyond the constitution's reach. Robertson recognizes the fundamental identity of article I, section 12 and rule 502(a) when he admits that the rule does not import the exceptions drafted into 502(b)'s language. We find that rule 502(a) is neither narrower nor broader than article I, section 12's privilege. Therefore, we conclude that neither article I, section 12 nor rule 502(a) gives the accused spouse the right to invoke the marital testimonial privilege.

 We now turn to Robertson's argument that the marital communication privileges contained in rule 502(b) and section 78–24–8(1) give him the right to prevent Cassie's testimony. Unlike marital testimonial privileges, marital communication privileges may be asserted by either spouse, even following the dissolution of the marriage. The rationale underlying marital communication privileges is that such privileges "secur[e] an expectation of privacy pertaining to confidential communications between spouses." Utah R. Evid. 502 advisory committee note. In addition, by securing this expectation of privacy, "marital communication privilege[s] . . .

encourage marital confidences, which in turn promote marital harmony." *Id.*

■ We begin with rule 502(b). That rule provides:

(2) An individual has a privilege during the person's life to refuse to testify or to prevent his or her spouse or former spouse from testifying as to any confidential communication made by the individual to the spouse during their marriage and to prevent another from disclosing any such confidential communications.

. . . .

(4) No privilege exists under subparagraph (b) of this rule:

. . . ;

(B) As to any communication which was made, in whole or in part, to enable or aid anyone

(i) to commit,

(ii) to plan to commit, or

(iii) to conceal a crime or a tort[.]

Utah R. Evid. 502. Robertson argues that Cassie should have been prohibited from testifying to statements made by him to her during their marriage. However, rule 502(b)(4)(B) denies the privilege for communications made to commit, to plan to commit, or to conceal a crime. In this case, any communication to which Cassie testified was made in the course of a plan to commit or the commission of a crime.

Robertson also relies on section 78–24–8(1) of the Code. Section 78–24–8(1), which predates the promulgation of rule 502 by this court, provides:

(a) Neither a wife nor a husband may either during the marriage or afterwards be, without the consent of the other, examined as to any communication made by one to the other during the marriage.

(b) This exception does not apply:

(i) to a civil action or proceeding by one spouse against the other; (ii) to a criminal action or proceeding for a crime committed by one spouse against the other;

(iii) to the crime of deserting or neglecting to support a spouse or child;

(iv) to any civil or criminal proceeding for abuse or neglect committed against the child of either spouse; or

(v) *if otherwise specifically provided by law.*

Utah Code Ann. § 78–24–8 (emphasis added). Robertson argues that this section lacks the exemption for a crime against a third person that is included in rule 502(b), thus giving him the right to prevent Cassie from testifying. We reject this argument.

■ Section 78–24–8(1) does not give Robertson the right to prevent Cassie from testifying because rule 502(b)'s exception for communications made in the course of a plan to commit or the commission of a crime falls within the statute's "otherwise specifically provided by law" exception. Rule 502(b) provides that the marital communications privilege does not apply where, as in this case, the communication is made in the course of a plan to commit or the commission of a crime. Thus, the "if otherwise specifically provided by law" portion of section 78–24–8(1)(b)(v) comes into play. Rule 502(b) is a "law" within the meaning of section 78–24–8(1). *See* Utah Const. art. VIII, § 4 ("The Supreme Court shall adopt rules of procedure and evidence to be used in the courts of the state and shall by rule manage the appellate process. The Legislature may amend the Rules of Procedure and Evidence adopted by the Supreme Court upon a vote of two-thirds of all members of both houses of the Legislature."); Utah Code Ann. § 78–2–4 (same); *see also State v. Benson,* 712 P.2d 256, 258 (Utah 1985) (stating that "the privileges provided for in section 78–24–8(1) . . . have been modified by [the predecessor rule to rule 502]"). Moreover, rule 501 states, "Except as provided in the Constitutions of the United States and the State of Utah, no person shall have a privilege to withhold evidence except as provided by these or other rules adopted by the Utah Supreme Court or by *existing statutory provisions not in conflict with them.*" Utah R. Evid. 501 (emphasis added). The advisory committee note to rule 501 adds that "all preexisting statutory privileges" are accepted "except those inconsistent with these rules." *Id.* advisory committee note. The note spe-

cifically indicates that "Utah Code Ann. § 78–24–8, insofar as it defines privileges relating to spouses, attorneys, clergy, and physicians ... [is] made ineffectual by the adoption of rules specifically redefining those privileges." *Id.* There is no doubt that rules of evidence and procedure promulgated by this court under its constitutional power operate to supersede inconsistent statutory provisions. *State v. Banner*, 717 P.2d 1325, 1333 (Utah 1986); *see also In re Rules of Procedure and Evidence to be Used in the Courts of this State*, 18 Utah Adv. Rep. 3 (Sept. 10, 1985) (per curiam) (adopting "all existing statutory rules of procedure and evidence not inconsistent with or superseded by rules of procedure and evidence heretofore adopted by this Court"). Therefore, Robertson is not entitled to prevent Cassie from testifying because section 78–24–8(1) is inapplicable here by virtue of its "unless otherwise specifically provided by law" exception.

We conclude that because Cassie was not compelled to testify against Robertson and because any communications made to her by Robertson were in furtherance of a crime, neither article I, section 12 of the Utah Constitution, rule 502 of the Utah Rules of Evidence, nor section 78–24–8(1) of the Code prohibits Cassie from testifying in this case.

Robertson's next claim of error relates to the trial court's failure to grant his motion for a mistrial following certain allegedly improper statements made in the presence of the jury. These statements arose out of the following sequence of events: First, the prosecutor asked Cassie why it was important that she explain the victim's murder to the jury. Cassie responded: "Because I did not act alone in this. I did not act alone. And he knew, just like you knew, and his attorney, everybody knew what would happen should he act crazy." Robertson's attorney then objected, moved to strike, and asked to approach the bench. With the jury present in the courtroom, the court held a bench conference off the record and the prosecutor privately admonished Cassie not to refer to Robertson's history relating to mental illness. Robertson's attorney then requested that the conversation be held someplace else, and the court·excused the jury. After the jury exited

the courtroom, Robertson's attorney reiterated her objection to Cassie's response and also objected to the prosecutor's admonition of Cassie. Robertson's attorney alleged that in admonishing Cassie, the prosecutor stated, "These proceedings have been sanitized" so loudly that one of the jurors may have overheard the statement. Concerned that the jury would infer from these comments that Robertson had feigned mental illness to avoid prosecution, Robertson's attorney moved for a mistrial.

In responding to the motion, the trial court first rejected Robertson's claim that any juror possibly overheard the prosecutor's admonishment. The judge noted that he was sitting closer to the witness box than the closest juror and he could not hear the prosecutor's admonition. Second, the court sustained Robertson's objection to Cassie's comment and ordered the comment stricken, but the court denied the motion for mistrial. The court stated that the reference to the word "crazy" or "craziness" at that point in the trial had no meaning whatsoever to the jury. Furthermore, the court noted that the way it occurred and the way it came in was such that the jury would not remember what Cassie said. The court denied the motion for mistrial on the basis of its foregoing observations. Following its denial of the motion, the court instructed the jury ·to disregard Cassie's statement.

On appeal, Robertson argues that these "improper" statements deprived him of the right to a fair trial by an impartial jury as guaranteed by the Sixth Amendment of the United States Constitution and article I, section 12 of the Utah Constitution. We reject this argument.

We will not reverse a trial court's denial of a motion for mistrial absent an abuse of discretion. *State v. Thomas*, 830 P.2d 243, 245 (Utah 1992). At trial, the court must determine whether an "incident *may have* or *probably* influenced the jury, to the prejudice of [the defendant]." *Burton v. Zions Coop. Mercantile Inst.*, 122 Utah 360, 249 P.2d 514, 517 (1952). If in exercising its discretion, the court concludes that the incident probably did not prejudice the jury, as the court did here, the court should deny the

motion. *Id.* "Once the trial court has exercised [its] discretion and made [its] judgment thereon, the prerogative of this court on review is much more limited." *Id.* Unless a review of the record shows that the court's decision is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion. *Id.* We review such a decision with just deference because of the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings, and this is especially so when what actually occurred is in dispute. *Cf. State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994).

 Robertson has failed to show the requisite abuse of discretion. The trial court determined that the possible prejudicial impact of Cassie's ambiguous statement was lost in the midst of the proceedings. But even so, he ordered Cassie's statement stricken and instructed the jury to disregard it. As for the prosecutor's comment, the court determined that it had not been heard by the jury. From the record, we cannot conclude that the trial court abused its discretion in denying Robertson's motion for a mistrial.

We next address Robertson's claim that the trial court committed reversible error when it refused to give either of his requested supplemental reasonable doubt instructions, both of which included an instruction on the theory of reasonable alternative hypothesis.

 A trial court has a duty to instruct the jury on the law applicable to the facts of the case. *State v. Potter*, 627 P.2d 75, 78 (Utah 1981). A defendant also has the right to have his or her theory of the case presented to the jury in a clear and comprehensible manner. *State v. Smith*, 706 P.2d 1052, 1058 (Utah 1985). "Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we may review for correctness." *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992) (citations omitted). However, "[i]t is not error to refuse a proposed instruction if the point is properly covered in the other

instructions." *State v. Sessions*, 645 P.2d 643, 647 (Utah 1982) (citations omitted). We review jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case.

Robertson submitted to the court the following two proposed instructions:

### Instruction # 6

I have heretofore told you that the burden is upon the State to prove Mr. Jerry Lee Robertson guilty beyond a reasonable doubt. By reasonable doubt is meant a doubt that is based on reason and one which is reasonable in view of all the evidence. Proof beyond a reasonable doubt is that degree of proof which satisfies the mind and convinces the understanding of those who are bound to act conscientiously upon it. A reasonable doubt is a doubt which reasonable men and women would entertain, and it must arise from the evidence or the lack of evidence in this case.

If, after an impartial consideration and comparison of all of the evidence in the case, you can candidly say that you are not satisfied of Mr. Robertson's guilt, you have a reasonable doubt. But if after such an impartial consideration and comparison of all the evidence you can truthfully say that you have an abiding conviction of Mr. Robertson's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt. A reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary.

To warrant you in convicting Mr. Robertson, the evidence must to your minds exclude every reasonable hypothesis other than that of the guilt of Mr. Robertson. That is to say, if after an entire consideration and comparison of all of the testimony in the case you can reasonably explain the facts given in evidence on any reasonable grounds other than the guilt of the defendant, you should acquit him.

### Instruction # 7

I have said that the burden of proof that the State has is to prove that Jerry Lee Robertson is guilty beyond a reasonable doubt. Proof of guilt beyond a reasonable doubt does not mean proof beyond all conceivable doubt. No event in human affairs has so absolutely certain a cause that one could not, through elaborate exercise of imagination, conceive of some other remotely possible explanation for what happened. In saying that the State must prove guilt beyond a reasonable doubt, what I mean is that you as jurors must all be satisfied that no other conceivable alternative explanation has any reasonable likelihood. If you conclude, based on the evidence in this case, or reasonable inferences therefrom, that there is a reasonable likelihood that the events charged against the Defendant can be explained on some basis inconsistent with guilt, then the State has not sustained its burden of proof. In essence, proof beyond a reasonable doubt is proof so convincing that a reasonable person would not hesitate to rely on it and act on it in the most important of his or her own affairs.

The court declined to give either instruction. Instead, it gave the jury the following instruction:

### Instruction # 15

All presumptions of law, independent of evidence, are in favor of innocence, and a defendant is presumed innocent until he is proved guilty beyond a reasonable doubt. In case of a reasonable doubt as to whether his guilt is satisfactorily shown, the defendant is entitled to a not guilty verdict.

I have heretofore told you that the burden is upon the State to prove the defendant guilty beyond a reasonable doubt. Proof beyond a reasonable doubt does not require proof to an absolute certainty. By reasonable doubt is meant a doubt that is based on reason and one which is reasonable in view of all the evidence. It must be a reasonable doubt and not a doubt which is merely fanciful or imaginary or based on a wholly speculative possibility.

Proof beyond a reasonable doubt is that degree of proof which satisfies the mind and convinces the understanding of those who are bound to act conscientiously upon it and obviates all reasonable doubt. A reasonable doubt is a doubt which reasonable men and women would entertain, and it must arise from the evidence or the lack of the evidence in this case.

The instruction the trial court actually gave is the same instruction the court of appeals approved in *State v. Ontiveros*, 835 P.2d 201, 206 (Utah.Ct.App.1992), *State v. Maestas*, 815 P.2d 1319, 1324 (Utah.Ct.App. 1991), *cert. denied*, 826 P.2d 651 (Utah 1991), and *State v. Pedersen*, 802 P.2d 1328, 1331 (Utah.Ct.App.1990), *cert. denied*, 815 P.2d 241 (Utah 1991). We conclude that the instruction given to the jury in this case was an appropriate statement of Utah law.

In *State v. Johnson*, 774 P.2d 1141, 1147–49 (Utah 1989), a majority of this court essentially adopted the analysis of Justice Stewart's dissent in *State v. Ireland*, 773 P.2d 1375, 1380–82 (Utah 1989), for reviewing the appropriateness of a reasonable doubt instruction. This analysis requires a three-part test. First, "the instruction should specifically state that the State's proof must obviate all reasonable doubt." *Ireland*, 773 P.2d at 1381 (Stewart, J., dissenting). Second, the instruction should not state that a reasonable doubt is one which "would govern or control a person in the more weighty affairs of life," as such an instruction tends to trivialize the decision of whether to convict. *Id.* (Stewart, J., dissenting). Third, "it is inappropriate to instruct that a reasonable doubt is not merely a possibility," although it is permissible to instruct that a "fanciful or wholly speculative possibility ought not to defeat proof beyond a reasonable doubt." *Id.* at 1382 (Stewart, J., dissenting).

Here, the instruction met all three tests. It contained a clear and unambiguous statement that the State's proof must obviate all reasonable doubt, did not define reasonable doubt in terms of the "more weighty decisions in life," and articulated an appropriate definition of "reasonable doubt." Though the instruction did not specifically negate the

"weighty decisions of life" analogy, nothing in *Johnson* or *Ireland* suggests that the instruction must do so.[6] We hold that this definition of reasonable doubt did not trivialize or diminish the required burden-of-proof standard.

It is true that the court's instruction did not include a generalized reference to a reasonable alternative hypothesis, as did the proposed instructions. However, we have clearly held that no such reasonable alternative need be mentioned where, as here, the jury is instructed that the State must prove a defendant's guilt beyond a reasonable doubt. *State v. Hansen*, 710 P.2d 182, 183 (Utah 1985) (citing *State v. McClain*, 706 P.2d 603, 606 (Utah 1985); *State v. Burton*, 642 P.2d 716, 719 (Utah 1982)). Therefore, we hold that the trial court did not err in refusing to use Robertson's proposed jury instructions.

We now consider Robertson's final claim, which is that the trial court erred by imposing restitution of costs incurred to extradite Robertson and to house Robertson at the State Hospital during his period of malingering. Robertson does not dispute the trial court's authority to order restitution of extradition costs under section 76–3–201(4)(b)[7] and costs incurred by the State Hospital during his period of malingering under section 77–15–9(4).[8] Instead, Robertson argues that the trial court abused its discretion by imposing restitution of costs without considering his financial history and impecunious status as required under sections 76–3–201(4)(c) and 77–32a–3 of the Code.

"In a criminal action the court may require a convicted defendant to make restitution and pay costs." Utah Code Ann. § 77–32a–1. Furthermore, section 76–3–201(4)(b)(i) states that "the court may, in addition to any other sentence it may impose, order that the defendant make restitution for costs expended by any governmental entity for the extradition." *Id.* § 76–3–201(4)(b)(i). The language of both sections is permissive; therefore, the imposition of restitution is a matter left to the discretion of the court. *State v. Snyder*, 747 P.2d 417, 420 (Utah 1987). However, before ordering restitution, the court must take into account the financial resources of the defendant.[9] Utah Code

---

**6.** Interestingly, both of Robertson's proposed instructions contained the impermissible analogy to the "weighty decisions of life." Robertson's first proposed instruction stated in relevant part, "[I]f after ... an impartial consideration and comparison of all the evidence you can truthfully say that you have an abiding conviction of Mr. Robertson's guilt, *such as you would be willing to act upon in the more weighty and important matters relating to your own affairs,* you have no reasonable doubt" (emphasis added). Robertson's other instruction stated in relevant part, "[P]roof beyond a reasonable doubt is proof so convincing that a reasonable person *would not hesitate to rely on it and act on it in the most important of his or her own affairs*" (emphasis added). Thus, the court would have erred if it had used either of Robertson's proposed instructions.

**7.** Section 76–3–201(4)(b)(i) provides:
 When a defendant has been extradited to this state under Title 77, Chapter 30, Extradition, to resolve pending criminal charges and is convicted of criminal activity in the county to which he has been returned, the court may, in addition to any other sentence it may impose, order that the defendant make restitution for costs expended by any governmental entity for the extradition.
Utah Code Ann. § 76–3–201(4)(b)(i).

**8.** This section provides in part, "If the defendant requested the examination and is found to be competent by the court, the department may recover the expenses of the examination from the defendant." Utah Code Ann. § 77–15–9(4).

**9.** Actually, there are several factors that the court is directed to take into account. Section 76–3–201(4)(c) instructs the trial court to take the following into account:

 (i) the financial resources of the defendant and the burden that payment of the restitution will impose, with regard to the other obligations of the defendant;
 (ii) the ability of the defendant to pay restitution on an installment basis or on other conditions to be fixed by the court;
 (iii) the rehabilitative effect on the defendant of the payment of restitution and the method of payment; and
 (iv) other circumstances which the court determines make restitution inappropriate.
Utah Code Ann. § 76–3–201(4)(c). Section 77–32a–3 provides:
 The court shall not include in the judgment a sentence that a defendant pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose and that restitution be the first priority.
*Id.* § 77–32a–3.

Ann. §§ 76–3–201(4)(c)(i), 77–32a–3. Moreover, when the court determines whether restitution of extradition costs is appropriate, "the court shall make the reasons for the decision a part of the court record." *Id.* § 76–3–201(4)(d)(i).

Although the trial judge did not specifically state that he considered Robertson's financial condition in ordering restitution, as a general rule, "this court upholds the trial court even if it failed to make findings on the record whenever it would be reasonable to assume that the court actually made such findings." *Ramirez,* 817 P.2d at 788 n. 6 (Utah 1991). As we discussed above, there are limited instances in which this assumption should not be made: when an ambiguity of the facts makes the assumption unreasonable, *id.* at 788, if the statute explicitly provides that written findings must be made, *Labrum,* 925 P.2d at 939–40, or when a prior case states that findings on a particular issue must be made to impress upon the trial court the importance of the issue so as to ensure that we can properly perform our appellate review function, *see Nelson,* 725 P.2d at 1356 n. 3. Though the imposition of restitution of the State Hospital's costs does not fit either exception to making the *Ramirez* assumption, imposing restitution of extradition costs falls under the *Labrum* exception.

As noted above, Robertson is correct in asserting that both sections 76–3–201(4)(c)(i) and 77–32a–3 require the court to consider his financial status before ordering restitution. Section 77–32a–3 merely requires the court to "take account of the financial resources of the defendant." While section 76–3–201(4)(c)(i) contains almost identical language, section 76–3–201(4)(d)(i) adds, "If the court determines that restitution is appropriate or inappropriate under this subsection, *the court shall make the reasons for the decision a part of the court record.*" Utah Code Ann. § 76–3–201(4)(d)(i) (emphasis added). We read this requirement to mean that after taking into account the factors listed in section 77–3–201(4)(c), the trial court must take the additional step of explicitly noting on the record the reasons for the decision it reached, reflecting the detailed factors listed in the statute. This directive precludes the use of the *Ramirez* assumption.

■ In the present case, though the court explained its reasons for imposing restitution of State Hospital costs incurred during Robertson's period of malingering, the court did not discuss on the record the reasons for ordering restitution of extradition costs. Because this error occurred at the sentencing stage, where costs were imposed, we vacate the portion of the order imposing extradition costs and remand to the trial court for further proceedings in compliance with section 76–3–201(4)(d)(i).

■ We now address the question of whether it would be reasonable to assume that the trial court found that defendant had the ability to pay the restitution of costs incurred by the State Hospital. Prior to the imposition of restitution costs at the sentencing hearing, the trial court considered the information set forth in the presentence report. The transcript of the sentencing hearing indicates that this report contained information concerning Robertson's education and job history. Robertson did not make the presentence report part of the record and points to no inaccuracy in the report. Aside from whatever information concerning Robertson's financial resources may be in the presentence report, other evidence in the record reveals that Robertson may have the ability to pay the restitution imposed by the court. For example, counsel for Robertson stated that he had held a number of jobs prior to his incarceration. Robertson was also employed at the State Hospital coffee shop during his pretrial incarceration.

The trial court's actions at the sentencing hearing indicate that it considered Robertson's financial resources. The court separated the costs owed to the State Hospital and emphasized that the restitution amount was conservative. Significantly, the court used its discretion not to impose additional restitution for other trial costs and further declined to impose any fine. This indicates that the court used some factor to limit the amount of restitution costs imposed on defendant. Because the court had already ordered defendant to pay a significant sum as restitution, this limiting factor was likely defendant's

ability to pay. Although the court did not make findings relating to Robertson's financial condition part of the record, we can reasonably assume that the court actually made such findings. We hold that because the trial court can properly be assumed to have considered Robertson's financial status, it did not err in imposing restitution of the State Hospital costs.

We affirm the jury's verdict and the trial court's sentence ordering restitution of costs incurred by the State Hospital. We vacate the trial court's order imposing restitution of extradition costs and remand the case to the trial court for further proceedings in compliance with section 76–3–201(4)(d)(i).

Justice HOWE and Justice RUSSON concur in Chief Justice ZIMMERMAN'S opinion.

STEWART, Associate Chief Justice, dissenting:

I dissent. I submit that the majority opinion implicitly assumes that a finding of malingering equals a finding of competence. It is possible for a person to be malingering and incompetent at the same time. The trial court addressed the question of malingering, but it did not address the question of defendant's competence to stand trial, even though a petition alleging incompetence was duly filed. Because the trial court failed to rule on defendant's allegations of incompetency as required by statute, I would remand for the statutorily mandated treatment of defendant's petition, especially in light of the trial court's initial finding of incompetency.

On the basis of the testimony of two psychologists, the court initially found defendant incompetent to stand trial and committed him to the state hospital. Upon receiving reports of possible malingering, the trial court conducted an evidentiary hearing on that question. The court ruled that defendant had been malingering, vacated its original finding of incompetency and order of commitment, and entered findings of fact and conclusions of law. Although some of the testimony presented at the hearing consisted of opinions about defendant's competency, the court's findings and conclusions related solely to the issue of malingering. At that point, the court stated that the issue of competency was at "equipoise," as if "the Finding and Order [which had held defendant was incompetent to stand trial] had never been forthcoming." The court also noted that defendant had the right to petition again for a determination of competency, which defendant did on March 3, 1994.

Yet the trial court has never entered an order on the legal question of defendant's allegations of incompetency, as required by Utah Code Ann. § 77–15–5(1). That provision, at the time Robertson filed his second petition, stated in pertinent part: [1]

> When a petition is filed pursuant to Section 77–15–3 the court shall enter an order for a hearing on the mental condition of the person who is the subject of the petition.

The trial court in this case has not complied with this statutory requirement. The majority apparently presumes that a competency ruling is merely a factual finding that is subject to the analysis presented in *State v. Ramirez*, 817 P.2d 774, 787 (Utah 1991). That is not correct. At the time Robertson filed his petition, section 77–15–5(1) required, and still requires, the court to make a specific legal determination about defendant's competency. Under Utah Code Ann. § 77–15–2, a person is incompetent to stand trial if he is unable "to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged" or he is unable to "consult with counsel and to participate in the proceedings against him with a reasonable degree of rational understanding." When Robertson filed his petition, the trial court was required to hold an evidentiary hearing on the matter and rule on defendant's competency to stand trial. The majority apparently argues that we can simply infer that factual findings on

---

1. This provision was substantially amended effective May 2, 1994, and now requires a preliminary ruling on the sufficiency of the allegations, followed by a full hearing if the court finds "that the allegations of incompetency raise a bona fide doubt as to the defendant's competency to stand trial."

the competency issue were made to support a legal ruling that was never entered. Neither *Ramirez* nor any other case supports such a proposition. Even if the court had entered a legal ruling on the issue of competency, the failure to make any factual findings renders this case closely analogous to *State v. Labrum*, 925 P.2d 937, 940–41 (Utah 1996), which held that failure to make statutorily mandated findings may constitute reversible error.

In short, I do not believe that trial courts can simply dispense with the statutory requirements of § 77–15–5(1) and § 77–15–2, as the majority allows in this case. Although the court did state that it "does not believe that the Defendant will cooperate in the performance of a competency evaluation and that, therefore, the evaluation will not render valid data," this statement was made prior to the petition for inquiry into defendant's competency, and it related specifically to the court's opinion as to defendant's malingering behavior. It therefore could not suffice as a ruling on defendant's allegations of incompetency. The issues of malingering and competency, though inevitably somewhat interrelated, are nevertheless legally and logically distinct and cannot be conflated for purposes of competency determinations.

In the context of a fundamental decision which goes to the heart of the authority and ability of the state to try a defendant for crimes charged, I would hold that trial courts must make their competency rulings, along with detailed findings supporting those rulings, on the record.

Justice DURHAM concurs in Associate Chief Justice STEWART'S dissenting opinion.