2001 UT 60

STATE of Utah, Plaintiff and Appellee,

v.

Bobbie Dawn WIDDISON, Defendant and Appellant.

No. 980297.

Supreme Court of Utah.

July 13, 2001.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Robert Parrish, Asst. Att'ys Gen., Salt Lake City, Dexter Anderson, Millard County, for plaintiff.

Ronald J. Yengich, Vanessa Ramos Smith, Randall T. Gaither, Salt Lake City, for defendant.

DURHAM, Justice:

¶ 1 A jury convicted defendant Bobbie Dawn Widdison of murder, a first degree felony under section 76–5–203(1) of the Utah Code, for the death of her nine-month old daughter. Widdison was also convicted of two counts of second degree felony child abuse under section 76–5–109(2)(a) of the Utah Code, and four counts of class A misdemeanor child abuse under section 76–5–109(3)(a) of the Utah Code. Widdison appeals her convictions, alleging numerous errors at trial. We affirm.

## BACKGROUND[1]

¶ 2 On February 22, 1996, at 12:26 a.m., nine-month-old Breanna Loveless, the daughter of defendant, was pronounced dead. Breanna died from the effects of multiple blunt trauma injuries, inflicted over a one-month period prior to her death.[2]

## I. ABUSE OF BREANNA

¶ 3 Breanna was born May 22, 1995, in Delta, Utah. Defendant had moved to Delta in August 1994 with her first two daughters from a previous marriage, five-year-old J.W., and four-year-old C.W. Breanna's father was Rick Sanders ("Rick"), a man whom defendant met and dated for only three weeks shortly after moving to Delta. Defendant was unhappy to learn she was pregnant.

¶ 4 After Breanna was born, she lived in a small apartment with defendant, J.W., and C.W. In November 1995, Travis Widdison (Travis)[3] began living with defendant and her daughters. Defendant had known Travis for years, and they soon became a couple. Neither defendant nor Travis worked but were home together most of the time.

¶ 5 Prior to January 1996, Breanna had been generally healthy, with the exception of recurring ear infections. Breanna regularly visited her father, Rick, and her paternal grandparents, Claude and Meridean Sanders (Mr. and Ms. Sanders), who often kept her overnight.

¶ 6 On January 12, 1996, Breanna went to visit her father and grandparents. Ms. Sanders and Rick became alarmed when they saw Breanna because her face was bruised

---

1. "We view the facts in the light most favorable to the jury verdict and recite them accordingly." State v. Loose, 2000 UT 11, ¶ 2, 994 P.2d 1237.

2. Although the immediate cause of death was pneumonia, the State's evidence established that the blunt trauma injuries contributed directly to Breanna's pneumonia and to her death. Defendant does not contest the evidence that Breanna's death was a homicide.

3. Although defendant and Travis Widdison were not married, they shared the same last name because Travis was the older brother of defendant's ex-husband, Jamie Widdison.

and she had a bad sore under her nose. Fingertip-size bruises covered her forehead and both her cheeks, and the nose sore was so bad that Breanna could not drink from her bottle.

¶ 7 Ms. Sanders and Rick took Breanna to see Dr. Stephen Shamo, who prescribed ointment for Breanna's nose sore. Dr. Shamo was not particularly troubled by the bruises; however, Ms. Sanders contacted the Division of Child and Family Services (DCFS) before taking Breanna home. Soon after Ms. Sanders arrived at home with Breanna, defendant called and demanded to know if Ms. Sanders was responsible for a DCFS caseworker coming to her apartment. Ms. Sanders admitted that she had called DCFS because she was concerned about Breanna's bruises and nose sore. Defendant claimed the bruises were caused by Breanna lying on toys or her bottle. Defendant then told Ms. Sanders that she would never see her grandchild again and ordered her to bring Breanna home in fifteen minutes, or she would have Ms. Sanders arrested for kidnaping. Ms. Sanders immediately took Breanna home. This visit was the last time Rick saw his daughter alive.

¶ 8 On January 30, defendant took Breanna to see Dr. Shamo to have him check on Breanna's cold and look at several new bruises on the baby's body. Dr. Shamo noted that the bruises on Breanna included one on the right side of her forehead, a raised red mark on the back of her head, a lesion above her left ear, and three diagonal parallel red marks on her back. Defendant claimed that Breanna got the bruises by becoming trapped between her crib mattress and its railing.

¶ 9 On February 7 or 8, defendant called Ms. Sanders and offered to let her see Breanna again if Ms. Sanders would pay defendant's electric bill. The Sanders paid the $126 bill, gave defendant an additional $20, and on February 9, Ms. Sanders picked up Breanna for an overnight visit. This was the first time the Sanders had seen Breanna

since January 12, and the Sanders were shocked at her appearance. Breanna was listless, had visibly lost weight, and had bruises all over her back, arms, and legs. Soon after Ms. Sanders noticed the bruises, defendant called to explain that Breanna's bruises had been caused by her being caught under the crib mattress. That night, Breanna did not play as she usually did, and she could not put her full weight on her legs.

¶ 10 On February 11, Breanna again came for an overnight visit with the Sanders. Before picking her up, Ms. Sanders called defendant to find out if Breanna was ready. While on the phone with defendant, Ms. Sanders heard Breanna crying loudly in the background. Defendant later claimed that Travis was washing Breanna's face, which caused her to cry. However, J.W., who was with defendant and Breanna at the time, later reported she saw defendant punch Breanna on the shoulder.

¶ 11 After Ms. Sanders took Breanna to her home, Breanna seemed very uncomfortable and whimpered a lot. Breanna was so miserable that Ms. Sanders did not change her into pajamas that night, but removed only her pants and left on her pullover shirt. When Ms. Sanders removed Breanna's shirt the next day, she saw that Breanna's shoulder was red and swollen. Ms. Sanders took Breanna home and told defendant that Breanna needed to go to the hospital to have her shoulder checked.

¶ 12 After some delay, defendant took Breanna to the hospital where Breanna was diagnosed with a broken collarbone. The attending nurse noted that Breanna's body was marked with multiple bruises in different stages of healing on several areas of her body. The hospital notified DCFS, and a caseworker arrived to investigate. Defendant claimed that Breanna must have broken her collarbone when she was stuck in her crib or while at her grandmother's house. The caseworker allowed Breanna to go home with defendant with the understanding that DCFS would monitor her home twice each

day.[4] This was the last day Ms. Sanders saw Breanna alive.

## II. BREANNA'S DEATH

¶ 13 On February 21, defendant took her two older children grocery shopping in the afternoon, while Travis and Breanna stayed at the apartment. At the store, defendant became angry with her two children and loudly verbally abused them for twenty minutes in front of Shannell Jeffrey Bird, a cashier. Bird heard defendant yell at the children saying she "was going to be arrested in the store for child abuse because she was going to f* * *ing kill them."

¶ 14 That night, at the apartment, defendant and Travis gave Breanna medicine for her cold at about 9:30 or 10:00 p.m. Having put the children to bed, defendant and Travis left them alone and went next door to play video games. Defendant returned to the apartment sometime between 10:30 and 11:00 p.m. to check on Breanna. Shortly after midnight, Travis went back to check on the children and found that Breanna was not breathing. Travis immediately retrieved defendant from next door. Defendant called emergency services while Travis attempted to perform CPR.

¶ 15 Deputy Sheriff Brett Nielsen arrived at the apartment at approximately 12:20 a.m. on February 22. He immediately noted several bruises on Breanna's forehead and a red mark under her chin. He checked for a pulse, but found none. The baby's body was cold and hard, her chest rigid. Breanna was transported to the hospital where doctors determined, based on the state of rigor mortis and lividity patterns, that Breanna had been dead for approximately two hours before she arrived at the hospital.

¶ 16 Later that morning, at about 2:00 a.m., a DCFS caseworker arrived at defendant's apartment to take J.W. and C.W. into

protective custody. Defendant became upset and said "she would kill herself if the other children were removed." She became hysterical, saying, "You think I f* * *ing beat my baby, then f* * *ing strangled her and I went to the bathroom and f* * *ing played with myself and had a f* * *ing orgasm." Defendant then threatened, "If you take my other kids, there will be *another* murder here." At that point, no one had suggested that Breanna had been murdered.

## III. JURY SELECTION

¶ 17 Defendant and Travis were charged with Breanna's murder and with various counts of child abuse. Prior to trial, in November 1996, defendant filed a motion to change venue because several witnesses for the State were physicians known by many residents in the small community, and because of extensive pre-trial publicity, including several newspaper articles regarding the case. The trial court denied the motion, but provided that defendant could raise the issue again at trial.

¶ 18 Trial commenced on April 30, 1998. There were ninety-nine prospective jurors who each answered an extensive written questionnaire based on questions posed by both the prosecution and the defense. Although these written questionnaires were destroyed after the trial was finished, subsequent questioning of potential jurors during voir dire was conducted based on their answers to the written questionnaire. Defense counsel was given free rein in questioning jurors and was not limited in any way.

¶ 19 During jury selection, defendant moved three times to change venue based on allegations of gossip and wide discussion in the community about the case. The three motions were denied, with the trial court indicating that it would deal with the issue later if it could not impanel an impartial jury.

---

4. Although DCFS was to monitor defendant's home twice each day, it is not clear whether this occurred. The record indicates that February 14 was the last day that a DCFS worker saw Breanna. A caseworker saw defendant on February 15, and attempted to see Breanna on February 20, but was prohibited by defendant from entering the apartment. It is not clear whether DCFS did anything to follow up on this incident.

¶ 20 After interviewing sixty-seven potential jurors, the court qualified twenty-nine. Of those twenty-nine, defense counsel had challenged only three. None of the three jurors challenged by the defense ended up sitting on the jury. After seating a panel of eight jurors and two alternates, defendant passed the jury panel for cause.

## IV. EVIDENCE OF HOMICIDE

¶ 21 At trial, the jury heard evidence from three State experts: Dr. Helen Britton, a pediatrician on Primary Children's Medical Center's child protection team; Dr. Robert Kirschner, former chief deputy medical examiner of Cook County, Illinois; and Dr. Edward Leis, medical examiner. The experts testified that Breanna's bruises could not have been caused by being caught in the crib, as defendant had claimed. Both Dr. Britton and Dr. Kirschner believed that Breanna's injuries were intentionally inflicted.

¶ 22 At trial, all three experts testified that Breanna had suffered several broken bones, including her broken collar bone, fractured arms, and a fractured leg. The fractures to Breanna's arms and legs were likely caused within two to four weeks prior to her death by someone forcibly grabbing and twisting them. The numerous bruises on Breanna's body, in various stages of healing, were the size of a fingertip, and suggested that someone had either forcibly grabbed, hit, and/or pinched her. Breanna also had a number of injuries on her nose and chin and inside her mouth, likely caused by a bottle or pacifier being repeatedly pushed forcefully against her face. The skin connecting Breanna's right ear to her scalp was torn, indicating someone had forcibly pulled her ear, ripping the skin. At the time of her death, Breanna suffered from a diaper rash so severely ulcerated that parts of her skin were completely missing. The testifying doctors agreed that a rash so severe would develop only from a child regularly being made to sit in a soiled diaper for six to seven hours at a time.

¶ 23 Dr. Leis further testified that although the immediate cause of Breanna's death was pneumonia, the numerous traumatic injuries inflicted on Breanna contributed significantly to her death. Both Dr. Kirschner and Dr. Britton testified that multiple, non-accidental, blunt trauma was a direct cause of Breanna's death and that her death was clearly a homicide.

## V. EVIDENCE OF DEFENDANT'S PRIOR BAD ACTS

¶ 24 Several witnesses testified regarding defendant's prior mistreatment of her children. Jamie Widdison (Jamie), defendant's ex-husband and the father of J.W. and C.W., testified that when J.W. was nine or ten months old, she suffered two broken forearm bones while in defendant's sole care. Dr. Britton presented evidence that J.W.'s injuries were non-accidental and were inconsistent with defendant's explanation that the injuries were caused by J.W. falling off the couch. Rather, Dr. Britton believed J.W.'s injuries were caused by someone forcibly grabbing her forearms and twisting them— just as Breanna's arms had been broken. Jamie also testified that when J.W. and C.W. were each between seven and twelve months old, defendant would lose her temper when they cried at night, would call them names, and would force them to take a bottle or pacifier. When the babies tried to spit out the bottle or pacifier, defendant would pinch each baby's face with her thumb on one side and her fingers on the other. Jamie also testified that defendant would often grab the babies by one arm to carry them to their crib or the couch.

¶ 25 Jody Finlinson, who lived with defendant for a few months in 1995, testified that she often saw defendant become angry with all three of her children. Jody testified that when defendant became angry, she would grab J.W. and C.W. by one arm, lift them off the ground, spank them, and then throw them into their room. Although Jody said that she never saw defendant hit Breanna, she did see defendant set Breanna down hard and walk away while Breanna cried.

¶ 26 Robyn Spilker, a relative of one of defendant's neighbors, testified that defen-

dant once jerked J.W. off the floor by one arm, called her a "little bitch," and told her to get back into their apartment. Shannell Jeffrey Bird, the cashier in the grocery store on February 21, testified about the incident where defendant verbally abused J.W. and C.W. in the afternoon of the day of Breanna's death.

¶ 27 A former friend of defendant, Nikki Lynn Greener McDermaid, testified about defendant's general lack of care for Breanna. McDermaid stated that she ended her friendship with defendant when Travis moved to Delta because McDermaid had heard that Travis was "bad news" and was afraid she could lose her own child by associating with Travis and defendant.[5] Defendant objected to McDermaid's testimony, and the court immediately struck McDermaid's statement and advised the jury to disregard it. At the end of McDermaid's testimony, defendant moved to strike McDermaid's entire testimony, then asked for a mistrial. The trial court denied the motion for mistrial, but granted defendant's request to strike McDermaid's testimony because it was not particularly relevant to the abuse charges.

## VI. TESTIMONY OF J.W. AND C.W.

¶ 28 Prior to trial, the State filed a notice of intent to call seven-year-old J.W. and six-year-old C.W. as witnesses and requested that their testimony be allowed through closed-circuit television, pursuant to rule 15.5 of the Utah Rules of Criminal Procedure. After defendant objected to the closed-circuit procedure, the trial court appointed an expert, Dr. Kevin Gully, to evaluate the two minor children and make a determination about the effects of their testifying in court. After holding an evidentiary hearing, the trial court found that the children would suffer serious emotional distress and that their tes-

timony would be inherently unreliable if required to testify in the presence of defendant and Travis. Therefore, the court allowed the children's testimony to be conducted via closed-circuit television.

¶ 29 Among other things, both J.W. and C.W. testified at trial that their mother had previously hit each of them with a belt. After the children's testimony, defendant sought to introduce transcripts of interviews with J.W. and C.W. conducted soon after Breanna's death. Defendant argued that the complete interviews were admissible as prior inconsistent statements of J.W. and C.W. The trial court, after reviewing the audio tapes and transcripts, ruled that the statements in the transcripts were not inconsistent but were cumulative of the children's testimony and excluded them. Instead, the court allowed defendant to examine the two detectives who interviewed the children regarding any statements that were inconsistent with the children's testimony.

## VII. BATTERED CHILD SYNDROME EVIDENCE

¶ 30 The State also presented trial testimony by a forensic pathologist, Dr. Kirschner, regarding "battered child syndrome," which refers to "children who have suffered multiple repetitive inflicted injuries at the hands of a caretaker." Dr. Kirschner testified that Breanna clearly fit within the diagnosis of battered child syndrome and that Breanna's injuries were inconsistent with defendant's explanations. Defendant did not object to this testimony.

## VIII. CONVICTION FOR MURDER

¶ 31 After a two-week trial, a jury convicted defendant of the murder of her infant daughter as well as several counts of felony and misdemeanor child abuse.[6]

---

5. McDermaid was apparently referring to Travis and to Valerie Widdison, a friend and neighbor of defendant, as being "bad news." Her exact words were: "Just when she—just when Valerie and Travis were moving down I'd quit [seeing defendant] because I had heard things that I didn't want, because I didn't want my girl taken

away from me. I had heard they [Travis and Valerie] were bad news."

6. The jury convicted Travis Widdison of one count of second degree felony child abuse, and two counts of class A misdemeanor child abuse. *See State v. Widdison*, 2000 UT App 185, ¶ 15, 4

## DISCUSSION

¶ 32 Defendant raises numerous issues on appeal. She claims: (1) the trial court erred by refusing to grant a change of venue; (2) the trial court erred in admitting testimony of various witnesses regarding prior bad acts of defendant; (3) the trial court erred in not granting a mistrial following inappropriate testimony by Nikki Greener McDermaid; (4) the trial court erred in allowing testimony of J.W. and C.W. via closed-circuit television; (5) the trial court erred in excluding·transcripts of interviews with J.W. and C.W., which allegedly included prior inconsistent statements; (6) the trial court erred in admitting evidence regarding battered child syndrome; (7) the cumulative effect of the trial court's errors was harmful; and (8) the evidence presented at trial was insufficient to convict defendant beyond a reasonable doubt of the crime of murder. We address each argument in turn.

### I. CHANGE OF VENUE

¶ 33 Defendant challenges the trial court's denial of her motions to change venue. Defendant claims she could not be tried by a fair and impartial jury because there was extensive pretrial publicity about the crime in the small community. The right to trial by an impartial jury is guaranteed by both the United States Constitution and the Utah Constitution. *See* U.S. Const. amend. VI; Utah Const. art. I, § 12. To protect that right, rule 29(d)[7] of the Utah Rules of Criminal Procedure permits a trial court to change venue if the court believes a fair and impar-

tial trial cannot be had in the jurisdiction where the action is pending. Utah R.Crim. P. 29(d); *see also State v. James,* 767 P.2d 549, 551 (Utah 1989) (referring to precursor to rule 29(d), Utah Code Ann. § 77–35–29(e) (1982 & Supp.1988)). Defendant claims she was prejudiced by the trial court's refusal to grant a change of venue.

### A. Destruction of Juror Questionnaires

■ ¶ 34 Defendant first argues that a new trial should be granted on the ground that the record is inadequate to review and demonstrate her claim because the trial court ordered the destruction of written questionnaires answered by potential jurors as part of voir dire. Defendant relies on *State v. Taylor,* 664 P.2d 439 (Utah 1983), where this court ordered a new trial because of a large number of inaudible responses in the voir dire transcript and a gap in the proceedings. *See id.* at 445–47.

¶ 35 This case, however, presents none of the concerns raised in *Taylor.* First, defendant makes no claim that there are gaps in the proceeding or that any responses to in-court questions are inaudible. Furthermore, in *Taylor,* the court explained that approximately ten of the inaudible responses either came from jurors whose impartiality was in question or were related to the specific issue of whether the trial judge elicited sufficient information to permit informed jury selection. *See id.* Here, defendant makes no claim that any of the impaneled jurors were not impartial or that she was unfairly limited in her voir dire examination of potential ju-

---

P.3d 100 (affirming Travis Widdison's convictions).

7. Rule 29 was amended in 1999 and subsection (e) was renumbered subsection (d). The amendment did not change the substance of the subsection, which provides:

(i) If the prosecution or a defendant in a criminal action believes that a fair and impartial trial cannot be had in the jurisdiction where the action is pending, either may, by motion, supported by an affidavit setting forth facts, ask to have the trial of the case transferred to another jurisdiction.

(ii) If the court is satisfied that the representations made in the affidavit are true and justi-

fy transfer of the case, the court shall enter an order for the removal of the case to the court of another jurisdiction free from the objection and all records pertaining to the case shall be transferred forthwith to the court in the other county. If the court is not satisfied that the representations so made justify transfer of the case, the court shall either enter an order denying the transfer or order a formal hearing in court to resolve the matter and receive further evidence with respect to the alleged prejudice.

rors. In fact, it is clear from the voir dire transcript that defense counsel had every opportunity to inquire into the potential biases of each juror, and did so. Defendant's trial counsel reviewed the completed questionnaires and then based his examination and several challenges for cause on juror responses to the questionnaires. Moreover, the court and parties frequently stated the responses to the written questionnaire on the record before inquiring more fully into areas triggered by those responses.

¶ 36 Defendant has not alleged any deficiency in the record other than the missing questionnaires. It is clear that any relevant juror responses to the written questionnaires were examined fully by defense counsel's subsequent questioning on the record.[8] There is therefore no indication that the record is inadequate or that defendant was prejudiced by the destruction of the written questionnaires.

### B. Impartiality of Jury

¶ 37 Defendant relies on *State v. James*, 767 P.2d 549 (Utah 1989), to challenge the trial court's refusal to grant a change of venue. *James*, however, is inapplicable in this case. In *James*, an interlocutory appeal, we reversed the trial court's denial of a change of venue and set forth four factors that trial courts should consider when determining whether a change of venue is warranted. Those factors are "(1) the standing of the victim and the accused in the community, (2) the size of the community, (3) the nature and gravity of the offense, and (4) the nature and extent of publicity." *Id.* at 552. Defendant argues that based on the four *James* factors, the change of venue should have been granted. Defendant asserts that (1) she had little standing in the community, living there for just a short time and with a

lifestyle different from most in the community, (2) the crime took place in a community even smaller than the one in *James*, (3) the nature and gravity of the offense was extreme as it involved the charge of murder of defendant's infant daughter, and (4) there was extensive pretrial publicity and gossip about defendant and the crime. Defendant claims that an evaluation of the four *James* factors required a change of venue, and the trial court abused its discretion in not granting it.

¶ 38 A decision to grant or deny a motion to change venue is within the trial court's sound discretion and will not be disturbed absent abuse of that discretion. *Id.* at 551. An evaluation of the *James* factors indicates that it would have been proper for the trial court to grant the change of venue. However, in *James*, we explained that the unique circumstance of the interlocutory appeal "afford[ed] us the opportunity to review the denial before any error committed would be prejudicial to defendant." *Id.* at 555. We reversed the order denying the motion to change venue in order to serve judicial economy and allow the trial to "go forward in another county where a jury [could] be selected free from any taint of prejudice, [and where a guilty] verdict would not be vulnerable to attack for community bias and hostility." *Id.* at 556. The *James* result is thus not dispositive in this case, which has already been tried and decided by a jury. On appeal from a jury verdict, we do not look to the *James* factors to determine whether the trial court abused its discretion in denying a change of venue. Instead, we examine whether defendant was ultimately tried by a fair and impartial jury. *See State v. Lafferty*, 749 P.2d 1239, 1250 (Utah 1988) ("The ultimate test of whether a failure to change venue constitutes an abuse of discretion is whether the defendant was tried by a fair and impartial jury.").

---

8. Defendant makes no claim on appeal that her trial counsel was ineffective with respect to jury voir dire or any other aspect of the trial. The record indicates that trial counsel diligently inquired into what each juror had heard about the case, the source of that information, whether the juror had formed any opinions, and the juror's relationship with potential witnesses and parties. It is clear from the record that defense counsel's questions were triggered by responses on the written questionnaires, and it is logical to assume that all questionable juror responses were fully explored on the record.

¶ 39 Here, defendant has presented no evidence demonstrating that any juror was biased. In fact, during the course of voir dire, the trial court granted all but three of defendant's challenges for cause, and none of those three remaining jurors challenged by defendant sat on the jury. Moreover, when the jury panel was seated, defendant passed the jury panel for cause, thereby acknowledging that the jury was impartial. Although defendant makes the vague assertion that she was generally prejudiced by the denial of change of venue in that the jury was not impartial, defendant is unable to point to any specific evidence of impartiality or bias. Therefore, we find the trial court did not abuse its discretion in denying the change of venue.

## II. PRIOR BAD ACTS EVIDENCE

¶ 40 Defendant next argues that the trial court erred in admitting evidence of defendant's prior mistreatment of her children. The prior bad acts evidence includes the testimony of Jamie Widdison, Jody Finlinson, Robyn Spilker, Shannell Jeffrey Bird, J.W., and C.W. Defendant asserts that testimony regarding prior abuse of J.W., C.W., and Breanna was inadmissible under Utah Rule of Evidence 404(b) because it was introduced solely to prove defendant's character as a bad mother and to show that she acted in conformity with that character. Defendant further argues that the evidence should have been excluded under Utah Rule of Evidence 403 because it was unfairly prejudicial.

### A. Rule 404(b)

¶ 41 Rule 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *In other words, evidence offered under this rule is admissible if it is relevant for a non-character purpose and meets the requirements of Rules 402 and 403.*

Utah R. Evid. 404(b) (emphasis added). Under rule 402, all relevant evidence is admissible except as otherwise provided in the rules. Utah R. Evid. 402. Rule 403 excludes relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403. Thus, evidence of prior misconduct is admissible under rule 404(b) if the evidence is relevant to a proper, non-character purpose, unless its danger for unfair prejudice and the like substantially outweighs its probative value. *State v. Decorso,* 1999 UT 57, ¶¶ 20–23, 993 P.2d 837, *cert. denied,* 528 U.S. 1164, 120 S.Ct. 1181, 145 L.Ed.2d 1088 (2000).

¶ 42 When reviewing a trial court's decision to admit evidence under rule 404(b), we apply an abuse of discretion standard. *Id.* at ¶ 18. However, in the proper exercise of that discretion, trial judges must "scrupulously" examine the evidence before it is admitted. *Id.*

¶ 43 Under Utah law, evidence of prior acts of child abuse committed by a defendant, including abuse against children other than the victim in the present case, may be admissible if it meets the requirements of rule 404(b).[9] *See State v. Tanner,* 675 P.2d 539, 546 (Utah 1983) (holding that

---

9. Defendant argues that "evidence of an accused's uncharged or unadjudicated alleged abuse against individuals other than the victim in the primary case is *per se* inadmissible." This argument is without merit. First, the plain language of rule 404(b) does not impose any per se prohibition on evidence of prior misconduct. *See* Utah R. Evid. 404(b). Moreover, defendant ignores Utah case law, which allows this type of

evidence under rule 404(b), even if uncharged or unadjudicated. *See, e.g., State v. Decorso,* 1999 UT 57, ¶¶ 11, 35, 993 P.2d 837 (finding no abuse of discretion in admitting evidence of uncharged and unadjudicated prior crime); *State v. Teuscher,* 883 P.2d 922, 928 (Utah Ct.App.1994) (finding no abuse of discretion in admitting evidence of uncharged and unadjudicated prior child abuse

evidence of specific instances of defendant's prior mistreatment of child victim is relevant to establish specific pattern of behavior by defendant toward victim); *State v. Teuscher*, 883 P.2d 922, 928 (Utah Ct.App.1994) (affirming allowance of evidence of acts of child abuse committed by defendant against children other than victim in instant case when evidence met requirements of rule 404(b)). As the court of appeals correctly stated, this type of evidence regarding prior instances of abuse is "clearly admissible in Utah to show identity, intent or mental state, and lack of accident or mistake." *Teuscher*, 883 P.2d at 927.

¶ 44 In this case, the parties extensively briefed and argued the issue of whether evidence of prior abuse of J.W. and C.W. was admissible under rule 404(b). Only after this "scrupulous" examination did the trial court find that the State had established a proper non-character purpose for introducing the evidence, and that the evidence was relevant to material facts at issue.

■ ¶ 45 Rather than being admitted to demonstrate defendant's character as a bad mother, the trial court specifically admitted the evidence for the purpose of proving identity of the abuser, intent and mental state of defendant, and lack of accident or mistake. Rule 404(b) provides that these are proper purposes for allowing evidence of prior bad acts. *See* Utah R. Evid. 404(b). Furthermore, the evidence was relevant to material facts at issue, as required by rule 402. As explained by the trial court, by pleading not guilty, defendant maintained she was not responsible for Breanna's death or her injuries. Defendant further claimed that Breanna's injuries were caused by accident when Breanna was caught under her crib mattress or when she lay on toys. Defendant also claimed that Breanna had been in someone else's care when her shoulder was broken and that pneumonia was the sole cause of Breanna's death. Because of defendant's claims, the identity of Breanna's abuser and killer was at issue. Also at issue was the question of whether Breanna's injuries were intentionally or accidentally inflicted. The evidence to which defendant objects was relevant because it was introduced to show that Breanna's injuries were not the result of accident, and that defendant was the one who inflicted Breanna's injuries.

¶ 46 Specifically, evidence that J.W. suffered broken forearm bones as an infant while in defendant's sole care was relevant to whether Breanna's fractures were non-accidental because the evidence showed that J.W.'s fractures had been caused by someone forcefully grabbing and twisting her arm, just as Breanna's arms had been broken. Evidence that defendant often lost her temper with J.W. and C.W. when they were infants, and that she would force them to take a bottle or pacifier and would pinch their cheeks when they cried, was relevant to establish non-accident and intent because the injuries to Breanna's mouth and gums were consistent with and explained by defendant's similar mistreatment of J.W. and C.W.

¶ 47 Likewise, evidence that defendant abused J.W. and C.W. when they were older, including evidence that defendant hit them with a belt, was also highly probative to show identity of Breanna's abuser. This evidence tended to show that defendant, as opposed to Travis or another caregiver, was the person who inflicted the bruises on Breanna's wrist, arms, and legs, as well as the fractures to her extremities. Furthermore, the evidence was relevant to demonstrate that Breanna's injuries were not the result of accident.

¶ 48 Evidence that defendant verbally abused J.W. and C.W. in an uncontrolled manner on the day Breanna died was probative of defendant's state of mind immediately prior to the time of Breanna's death. The evidence demonstrated defendant's lack of self-control and low tolerance for her children that day, the same day that some of Breanna's injuries were inflicted and the day on which she died. This evidence was also relevant to the identity of Breanna's abuser because it showed that defendant, as opposed

against children other than victim in instant case).

to Travis, was more likely to have inflicted Breanna's injuries on that day.

¶ 49 Based on the facts of this case, the trial court did not abuse its discretion in finding there was a proper, non-character purpose for admitting prior misconduct evidence, and that it was relevant to material facts at issue in the case. Therefore, we turn to the final requirement under rule 404(b), that the evidence meets the requirements of rule 403.

### B. Rule 403

¶ 50 Defendant claims the prior misconduct evidence should have been excluded because it was unfairly prejudicial. When conducting a rule 403 review of prior misconduct evidence, trial courts should consider several factors, including "the strength of the evidence as to the commission of the other crime [or misconduct], the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will rouse the jury to overmastering hostility." State v. Shickles, 760 P.2d 291, 295–96 (Utah 1988) (quoting E. Cleary, McCormick on Evidence § 190, at 565 (3d ed.1984)).

¶ 51 As explained above, the evidence of defendant's prior misconduct was highly probative to prove the identity of Breanna's abuser, defendant's intent, and lack of accident as an explanation of Breanna's injuries. Furthermore, the evidence was strong, especially given that several witnesses testified to the same type of conduct by defendant. Evidence that defendant mistreated her two other children when they were babies in a way that would explain Breanna's injuries was essential because it was the most conclusive evidence the State had to show that defendant was the abuser, and it supported the medical evidence that Breanna's injuries were not accidental. Moreover, J.W. and Breanna suffered nearly identical fractures to their arms. Although the interval of time was relatively long between the mistreatment of J.W. and C.W. as infants and the abuse of Breanna, it was particularly probative because J.W. and C.W. were about the same age as Breanna when defendant mistreated them in a manner that would explain Breanna's injuries. The interval of time between the incident at the grocery store when defendant verbally abused J.W. and C.W. was just hours before Breanna's death, and thus was highly probative of the defendant's state of mind on that day.

¶ 52 Finally, the degree to which the evidence was likely to unfairly prejudice the jury did not substantially outweigh its highly probative value. The jury already had evidence of the month-long period of abuse of Breanna, which resulted in her fatal injuries and illness. The evidence of mistreatment of J.W. and C.W. was no worse than the evidence already before the jury. Therefore, the evidence of defendant's prior bad acts was not such that it would rouse the jury to overmastering hostility. In light of the Shickles factors, we cannot say that the evidence was substantially outweighed by the danger of unfair prejudice or that the trial court abused its discretion in admitting it.

### III. TESTIMONY OF NIKKI GREENER McDERMAID

■ ¶ 53 Defendant next argues that the trial court erred by not declaring a mistrial after the testimony of Nikki Greener McDermaid. McDermaid testified that she ended her friendship with defendant because she had heard that Travis was "bad news."[10] Defendant objected, and the trial judge immediately ordered the statement to be stricken and advised the jury to disregard it. The remainder of McDermaid's testimony was directed toward defendant's neglectful attitude and behavior toward Breanna. She testified that defendant had little or no physical contact with Breanna, that defendant rarely

---

10. McDermaid testified that Travis and *Valerie* Widdison were bad news. Valerie was a friend and neighbor of defendant.

picked up Breanna when she cried, and that defendant failed on occasion to feed Breanna. She also stated that defendant would often assign J.W. and C.W. to care for Breanna, including giving the baby her bottle or putting her in a swing. At the end of McDermaid's testimony, defendant first moved to strike the entire testimony and asked for a curative instruction, then requested a mistrial. The court denied the motion for mistrial, but granted defendant's request to strike McDermaid's entire testimony on the ground that the evidence of neglect was not particularly relevant to the abuse charges. The court instructed the jury that it was not to consider any of McDermaid's testimony.

¶ 54 A trial court's denial of a motion for mistrial will not be reversed absent an abuse of discretion. *State v. Robertson*, 932 P.2d 1219, 1230–31 (Utah 1997). This is because the trial court is in the best position to determine whether the incident prejudiced the jury. *See id.* Therefore, we will not find an abuse of discretion unless "a review of the record shows that the court's decision is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have a fair trial." *Id.*

¶ 55 Here, there is no indication that McDermaid's testimony so influenced the jury that defendant did not have a fair trial. First, the testimony of defendant's neglect of Breanna was not particularly inflammatory in light of the abundant evidence that defendant physically abused all of her children as infants, including breaking their bones and otherwise treating them roughly. Second, McDermaid's comment that Travis was "bad news" was not inflammatory toward defendant because defendant was not the one to whom McDermaid's comment referred. McDermaid was not a critical witness to the State, and defendant points to nothing in the record that suggests the jury was influenced by her testimony. Therefore, defendant was not prejudiced and the trial court was well within its discretion in striking the testimony rather than declaring a mistrial.

## IV. TESTIMONY VIA CLOSED–CIRCUIT TELEVISION

¶ 56 Defendant next argues that the trial court erred in allowing J.W. and C.W. to testify via closed-circuit television because there was no showing that the children would suffer emotional strain so serious as to justify impinging on her right to face-to-face confrontation. Rule 15.5(2) of the Utah Rules of Criminal Procedure permits a child under the age of fourteen to testify via closed-circuit television, outside of the defendant's presence, only if "the court determines that the child will suffer serious emotional or mental strain if he is required to testify in the defendant's presence, or that the child's testimony will be inherently unreliable if he is required to testify in the defendant's presence." Utah R.Crim. P. 15.5(2).[11]

¶ 57 The United States Supreme Court has held that trial procedures other than face-to-face confrontation are permissible "if [the] procedure [is] necessary to further an important public policy. The protection of child witnesses is ... just that policy." *Coy v. Iowa*, 487 U.S. 1012, 1025, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). In a later case involving a similar state statute, the Supreme Court held "the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Maryland v. Craig*, 497 U.S. 836, 855, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

11. Once the court has made the required findings, the child's testimony may be conducted via closed circuit under specified conditions, including that the child be informed that the defendant is present at the trial and may listen to the child's testimony, that the defendant is permitted to observe and hear the child's testimony, and that the defendant has a means of two-way telephonic communication with her attorney during the testimony. Utah R. Crim P. 15.5(2)(a)(i)-(iv). Defendant does not challenge the procedures used in this case, which included all those required by rule 15.5.

¶ 58 The Supreme Court also held, however, that there must be a showing of necessity for the alternate procedure in each case, supported by the following three findings: (1) that the procedure "is necessary to protect the welfare of the particular child witness"; (2) that "the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and (3) that "the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis,* i.e., more than mere nervousness or excitement or some reluctance to testify." *Id.* at 855–56, 110 S.Ct. 3157 (internal quotation marks and citations omitted).

¶ 59 In this case, the trial court appointed psychologist Kevin Gully to evaluate whether the requirements of rule 15.5(2) were met. After extensive interviews, testing, and observation, Dr. Gully submitted a written report stating his conclusions and also testified at a pre-trial hearing on the issue. Based on that evidence, the trial court found that the children would suffer emotional or mental strain and that their testimony would likely be unreliable if forced to testify in the presence of defendant and Travis. Defendant's claim on appeal is that evidence of J.W. and C.W.'s distress did not meet the third *Craig* factor that the child's emotional distress be more than de minimis. *See Craig,* 497 U.S. at 855–56, 110 S.Ct. 3157. Therefore, the critical inquiry in this case is whether the trial court's factual findings are supported by sufficient evidence.

■ ¶ 60 A trial court's factual findings will not be reversed absent clear error. *State v. Gamblin,* 2000 UT 44, ¶ 17 n. 2, 1 P.3d 1108; *State v. Alvarez,* 872 P.2d 450, 460–61 (Utah 1994). To demonstrate that a finding of fact is clearly erroneous, the defendant "must first marshal all the evidence that *supports* the trial court's findings. After marshaling the supportive evidence, the appellant then must show that, even when viewing the evidence in a light *most favorable to the trial court's ruling,* the evidence is insufficient to support the trial court's findings."

*Gamblin,* 2000 UT 44, at ¶ 17 n. 2, 1 P.3d 1108 (citations omitted).

■ ¶ 61 In this case, defendant has failed to meet her marshaling burden. In her brief, defendant does not set forth evidence in support of the trial court's findings; rather, defendant merely cites to portions of the testimony that favor her position. Defendant's failure to marshal the evidence and demonstrate that the trial court's findings were clearly erroneous in light of the evidence allows us to affirm the court's findings on that basis alone. *See id.* Furthermore, the evidence relied on by the State demonstrates that the trial court's findings are supported by sufficient evidence and thus were not clearly erroneous.

¶ 62 In this case, Dr. Gully testified that both children would be "less apt to experience serious emotional distress, be more likely to think clearly and be more responsive to questions if they testify out of the presence of their mother and [Travis]." The testimony indicated that J.W. experienced serious emotional distress to the point she would not be responsive in the presence of defendant and Travis. Dr. Gully expressed his belief that it would "take very little ... to push [J.W.] across that threshold where she may become mute." Furthermore, Dr. Gully opined that C.W. would likely be non-responsive, make only general allegations, and not provide details in the presence of defendant.

¶ 63 Based on the evidence in support of its findings, the trial court did not commit error in finding that J.W. and C.W. would suffer more than de minimis emotional strain. Therefore, the trial court's finding that the State established a necessity for the closed-circuit television procedure was reasonable.

## V. PRIOR INCONSISTENT STATEMENTS OF J.W. AND C.W.

■ ¶ 64 Defendant next argues that the trial court erred in not admitting audio tapes and transcripts of police interviews with J.W.

and C.W. Defendant contends that the transcripts were admissible as prior statements that were inconsistent with the children's trial testimony.

¶ 65 The trial court excluded the audio tapes and transcripts on the ground that most of the statements were not inconsistent, but merely cumulative of the children's testimony. Instead, the court permitted defendant to examine the two detectives who interviewed the children regarding any statements made that were inconsistent with their testimony at trial.

¶ 66 On appeal, defendant identifies only one prior statement as being improperly excluded, namely, that J.W. stated that Ms. Sanders often hit Breanna. Defendant claims this statement should have been admitted because it pointed to Ms. Sanders, not defendant, as the abuser. As the State points out, however, defendant's argument fails for three reasons. First, J.W.'s statement was inadmissible for lack of foundation because J.W. had no personal knowledge that Ms. Sanders ever hit Breanna. *See* Utah R. Evid. 602. Although J.W. stated that Ms. Sanders hit Breanna twice, J.W. denied ever seeing this happen. Second, J.W. never testified at trial regarding whether Ms. Sanders hit Breanna. Therefore, J.W.'s statement during her interview was not inconsistent with her trial testimony. *See State v. Velasquez*, 672 P.2d 1254, 1264–65 (Utah 1983) (stating that, under predecessor rule, it was error to admit prior statements made by witness that witness was not asked about at trial). Finally, the trial court gave defendant the opportunity to examine the two detectives who conducted the interviews about any prior inconsistent statements J.W. and C.W. made during the interviews. During examination of the detectives, defendant never asked them about J.W.'s statement regarding Ms. Sanders.

¶ 67 Defendant has not demonstrated that the audio tapes and transcripts contained any prior inconsistent statements that should have been admitted, nor has she shown any prejudice. She was given full opportunity at trial to explore any alleged inconsistent statements made to the police, and her counsel had full access to the tapes and transcripts. Therefore, the trial court did not abuse its discretion in excluding the audio tapes and transcripts of the prior interviews of J.W. and C.W.

## VI. BATTERED CHILD SYNDROME EVIDENCE

¶ 68 Defendant next argues that the trial court erred in admitting expert testimony by Dr. Kirschner with regard to "battered child syndrome." Defendant concedes that battered child syndrome evidence is admissible, but contends that the proper foundation was not laid for admitting the testimony. Defendant also contends that Dr. Kirschner's testimony that Breanna's injuries were inconsistent with defendant's version of events was inappropriate because it was an improper opinion testimony regarding defendant's credibility and culpability.

 ¶ 69 Defendant did not object to Dr. Kirschner's testimony at trial. Therefore, defendant must demonstrate that the trial court committed "plain error" in admitting the testimony. To establish plain error, defendant must show (1) that there was error, (2) that any error was obvious, and (3) that the error was harmful, i.e., that absent the error, there is a reasonable likelihood that the verdict would have been different. *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993).

¶ 70 At trial, Dr. Kirschner testified that the term "battered child syndrome" referred to "children who have suffered multiple repetitive inflicted injuries at the hands of a caretaker." He explained that a common characteristic of the syndrome was that the caretaker would give an explanation of how injuries occurred that was inconsistent with the nature of the injuries. Dr. Kirschner further testified that Breanna clearly fit within the definition of battered child syndrome and that her injuries were inconsistent with defendant's version of events.

 ¶ 71 In light of this court's well-established precedent permitting the admis-

sion of battered child syndrome evidence, defendant cannot demonstrate that the trial court committed plain error in admitting Dr. Kirschner's testimony. *See State v. Tanner,* 675 P.2d 539, 541–45 (Utah 1983) (holding that battered child syndrome evidence is admissible to prove non-accidental injuries when given by properly qualified expert witness); *State v. Allen,* 839 P.2d 291, 297 (Utah 1992) (reaffirming that battered child syndrome evidence is admissible to prove non-accidental injuries). As explained above, the question of accident was at issue in this case because of defendant's explanations of how Breanna's injuries occurred.

¶ 72 Furthermore, defendant's contention that Dr. Kirschner's testimony was an improper opinion on defendant's credibility and culpability is also unsupported by our case law. In *State v. Tanner,* we expressly stated that "[t]he expert should be able to testify in detail regarding the nature of the child's injuries *and whether the explanation given for the injuries is reasonable.*" 675 P.2d at 544 (emphasis added). Moreover, we stated that an expert opinion with regard to the existence of battered child syndrome is not an opinion as to a defendant's culpability. *Id.* at 542. Given our previous case law regarding battered child syndrome evidence, the trial court did not commit plain or obvious error by admitting the evidence in this case.

## VII. CUMULATIVE ERROR DOCTRINE

¶ 73 Defendant next claims that even if no single error was harmful, the cumulative effect of the numerous errors she alleges was harmful to her right to receive a fair trial. Under the cumulative error doctrine, we will reverse a jury verdict "only if the cumulative effect of the several errors undermines ... confidence that a fair trial was had." *State v. Dunn,* 850 P.2d 1201, 1229 (Utah 1993) (citations omitted). Although defendant has alleged several errors, we have found none. Therefore, the cumulative error doctrine does not apply.

## VIII. SUFFICIENCY OF THE EVIDENCE

¶ 74 Defendant finally argues that the evidence presented at trial was insufficient to convict beyond a reasonable doubt of the crime of murder. In considering an insufficiency of the evidence claim, this court reviews "the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Brown,* 948 P.2d 337, 343 (Utah 1997) (quoting *State v. Petree,* 659 P.2d 443, 444 (Utah 1983)). Moreover, " 'we assume that the jury believed the evidence supporting the verdict.' " *Brown,* 948 P.2d at 344 (quoting *State v. Dunn,* 850 P.2d 1201, 1213 (Utah 1993)). A jury conviction will be reversed for insufficient evidence "only if the evidence presented at trial is so insufficient that reasonable minds could not have reached the verdict." *State v. Colwell,* 2000 UT 8, ¶ 40, 994 P.2d 177. "We will not lightly overturn a jury verdict." *Id.* (citing *State v. McClain,* 706 P.2d 603, 605 (Utah 1985)).

¶ 75 In this case, the trial court instructed the jury that to convict defendant of murder, the State had to prove that defendant, (1) "[w]hile in the commission or attempted commission of Child Abuse; that is, while knowingly or intentionally inflicting upon [Breanna] a serious physical injury, or, having the care or custody of [Breanna], intentionally or knowingly caused or permitted another to inflict serious physical injury upon [Breanna]"; and (2) "[c]aused the death of [Breanna]." *See* Utah Code Ann. §§ 76–5–203(1)(d) (1999), 76–5–109(2)(a) (1999). The instruction was based on section 76–5–203(1) of the Utah Code, which defines the crime of murder. *See* § 76–5–203(1).

¶ 76 The first element, that defendant intentionally or knowingly inflicted serious physical injury or caused serious physical injury upon Breanna, was supported by overwhelming medical evidence and lay testimony. The evidence suggested that Breanna's injuries were non-accidental, and that defendant battered her other children in a remark-

ably similar manner and one that explained how Breanna's injuries were inflicted.

¶ 77 The second element of murder, that defendant caused Breanna's death in the course of the commission of child abuse was also amply supported by the evidence at trial. There was medical testimony that Breanna suffered serious, non-accidental injuries that were the significant cause of her death. Furthermore, the evidence pointed to defendant as the person who inflicted Breanna's fatal injuries.

¶ 78 It was the jury's responsibility to weigh the evidence and judge the credibility of each witness. Given the overwhelming evidence in support of the jury's verdict, it is entirely reasonable that a jury could have reached a verdict convicting defendant of murder.

## IX. CONCLUSION

¶ 79 Based on the foregoing, defendant's convictions are affirmed.

¶ 80 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURRANT, and Justice WILKINS concur in Justice DURHAM's opinion.