2002 UT App 126

**STATE of Utah, Plaintiff and Appellee,**

v.

**Angel Joseph MARTINEZ, Defendant and Appellant.**

**No. 20001128–CA.**

Court of Appeals of Utah.

April 25, 2002.

Stephanie Ames and Gregory G. Skordas, Gustin, Christian, Skordas & Caston, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Kenneth A. Bronston, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before JACKSON, P.J., BILLINGS, Associate P.J., and DAVIS, J.

OPINION

DAVIS, Judge:

¶1 Appellant Angel Joseph Martinez (Martinez) appeals his convictions of aggravated burglary and murder. Martinez challenges whether the trial court's determination that the eyewitness identification of Martinez as the driver of a getaway car was constitutionally reliable, whether the trial court erred in denying Martinez's Motion for a Mistrial, and whether the State failed to provide sufficient evidence for a jury to convict Martinez of murder and aggravated burglary. We affirm.

BACKGROUND [1]

¶2 On August 3, 1999, two men with guns ran into the home of Matthew Moya (Moya). One of the intruders wore clothing that covered his face and the other wore sunglasses. The intruders ordered Moya's fiancé, Anita Archuleta (Archuleta), brother-in-law, and three young children to lie down on the floor. One of the intruders then went into the back room where Moya was sleeping. A struggle ensued between Moya and the intruder. During the struggle, the unidentified intruder shot Moya twice and Moya fell to the floor. As the two intruders were exiting the home, "they looked back at [Moya] and shot him one more time." Moya died as a result of the shooting.

¶3 Earlier that day, about 3:20 p.m., Moya and his family had returned home from the grocery store. At about 3:30 p.m., Jay Ingleby (Ingleby) and Mrs. Dikki Jo Black (Black), who was picking up her children from a babysitter's home, saw two men exit an old green car and run toward the Moya home. Ingleby thought it was strange that one of the men was wearing a large, hooded sweatshirt that concealed his face because it was 97 degrees outside. Just after Ingleby lost sight of the two men, he heard shots. He then noticed the same two men running

from the Moya residence and saw one of the men stuff a revolver into his waistband. Just ahead of the men, Ingleby noticed an old, green Cadillac driving slowly up the block. He watched as the rear doors opened, the two men jumped into the back seat, and the car sped from the scene. Shortly thereafter Ingleby found himself calming Archuleta, who said Moya had just been shot.

¶4 Black was standing in her babysitter's front yard where she saw the two men jump into the green car as it slowed down. At that time Black made eye contact with the driver for between ten to fifteen seconds. Initially, Black told the police that the man driving the car and the two men the driver picked up were between eighteen and twenty-five, Hispanic, with darker skin, short black hair, and dark eyes. Black stated that she was not good at the "age thing" and that the age range was for the group as a whole and did not specify an age for the driver of the vehicle. In addition, Black told the officer that the driver had "dark, shiny skin," but was not sure about the "shiny part."

¶5 Before presenting Black with a photo spread, Officer Yoshikawa telephoned and asked whether it was possible that the person she saw driving the car could be older. Black indicated that it was possible. Two days later, Detective Yoshikawa arrived at Black's home and presented her with a photo spread that in addition to a photo of Martinez, contained five other men in their thirties resembling him. Black took her time reviewing the photographs and identified Martinez as the driver of the car. Black testified that she was unsure about the photograph until she saw a color copy from which she recognized his eyes, face, hairline, and the expression on his face. In addition, she pointed out how the color photograph captured the differences between his two eyes, "as if they could have belonged to two different people." In court, Black identified Martinez as the driver she saw on the day of the shooting based on his unique eyes and hairline.

*State v. Loose,* 2000 UT 11, ¶2, 994 P.2d 1237.

---

1. "We view the facts in the light most favorable to the jury verdict and recite them accordingly."

¶ 6 The car seen fleeing the scene was an older model, green, four-door Cadillac with Utah Centennial plates. Ingleby specifically observed that the car was two-tone green, dark green on top and a brighter lime green on bottom. Ingleby also noticed that "on the back by the back bumper and taillights [there were] some rust spots across the back." Ingleby described the car as nice looking in pretty good condition.

¶ 7 Martinez was arrested and charged with aggravated burglary, a first degree felony, in violation of Utah Code Ann. § 76–6–203 (1999), and murder, a first degree felony, in violation of Utah Code Ann. § 76–5–203 (1999). Notice was given that both offenses were subject to enhancement penalties under Utah Code Ann. § 76–3–203 (1999), commission of offenses with a dangerous weapon, and Utah Code Ann. § 76–3–203.1 (1999), commission of offense in concert with two or more individuals.

¶ 8 A hearing on Martinez's Motion to Suppress Witness Identification was held on January 14, 2000. Martinez was present and represented by counsel. Testimony was received from Detective Yoshikawa and Black. The court, being "aware of the criteria set forth in *State v. Long*, [721 P.2d 483 (Utah 1986)], for consideration of eyewitness testimony," denied the Motion and ruled orally that the procedure was not impermissibly suggestive, stating "[o]n the contrary, it's sort of the textbook example of what one hopes an officer will do." In its written order, the court concluded that the "manner in which the photo spread was prepared by Detective Yoshikawa and presented to Mrs. Black establishes that it was not unduly suggestive."

¶ 9 While Martinez was being held at Oxbow jail following his arrest, he confessed to Roger Ashworth, another inmate in the jail, to participating in the offense.

¶ 10 At trial, Roger Barney testified that in April 1999 he sold his father's 1977 two-toned green Fleetwood Cadillac to Martinez. At the time of the sale, the car was in "excellent shape except on the rear panel it was starting to get a little rust." Barney did not see the car again until it was at Evans & Sons Automotive, where it was smashed and crushed on a pile of cars.

¶ 11 Steven Evans, who owns Evans & Sons Automotive, testified that on or about August 3, 1999 between 4:00 and 5:00 p.m., Martinez drove the Cadillac to Evans & Sons and told the owners to scrap the car out because it had a bad engine and was making noise. In the past, Martinez had car engines replaced by Evans & Sons and Evans thought it out of character for Martinez to junk the car without first having a diagnosis done. Two months later, at the request of the prosecution investigator, Evans removed the Cadillac from the junk pile and found that the engine ran "okay" and "sounded fine" when he replaced the battery and starter motor. Evans's son Brad confirmed that the engine did not sound as though it was "blown" when it was later tested. After he heard the motor, Brad was surprised that the car had been junked.

¶ 12 On cross-examination by defense counsel, Archuleta testified that she had given Detective Yoshikawa the name of Jose Nava (Nava) as a possible suspect in the shooting because Moya owed Nava some money in connection with some dealings Moya had with Nava. On re-direct examination, Archuleta stated that Nava was a friend of Moya's because "they called [Moya] like twice before this had happened." She then testified that she knew this because "[Moya] told [her] that Jose [Nava] called." Defense counsel objected to the testimony as hearsay and the objection was immediately sustained. Archuleta later testified, without objection, that it was her understanding that Moya made one of the calls to Martinez.

¶ 13 Martinez then moved for a mistrial based on Archuleta's testimony claiming he was unaware the witness would testify about the nexus between Nava and Martinez. Detective Yoshikawa informed the court that he had interviewed Archuleta about the matter and made a report referencing the telephone conversation. This report was given to the prosecutor, who inadvertently neglected to provide a copy to the defense.

¶ 14 The jury convicted Martinez of the offenses as charged and entered a special verdict, finding that Martinez had committed

the murder with a dangerous weapon and acted in concert with two or more individuals in committing both crimes. The trial court sentenced Martinez to consecutive statutory nine years to life prison terms. Martinez appeals.

## ISSUES AND STANDARD OF REVIEW

¶ 15 Martinez argues that the introduction of Black's eyewitness identification at trial violated his right to due process of law under Article I, Section 7 of the Utah Constitution and the Fourteenth Amendment to the United States Constitution because the identification was unreliable and impermissibly suggestive. The trial court's decision to admit eyewitness identification evidence is a mixed question of fact and law. The trial court's findings are viewed in the light most favorable to the court's decision and will be reversed "only if they are against the clear weight of the evidence." *State v. Ramirez*, 817 P.2d 774, 782 (Utah 1991). We review for correctness the trial court's conclusion that the eyewitness identification evidence is reliable. *See id.*

¶ 16 Second, Martinez argues that the trial court erred in denying his motion for mistrial when the court allowed the testimony by Archuleta to be admitted. "We review rulings on motions for a mistrial based on prosecutorial misconduct [i.e., discovery violations] for abuse of discretion." *State v. Reed*, 2000 UT 68,¶ 18, 8 P.3d 1025; *see also State v. Harmon*, 956 P.2d 262, 276 (Utah 1998) (stating standard is met only if error is "sub-

stantial and prejudicial") (quotations and citations omitted).

¶ 17 Finally, Martinez argues that the evidence presented at trial was insufficient to support a verdict of guilty. "When findings of all required elements of the crime can be reasonably made from the evidence, including the reasonable inferences that can be drawn from it, we stop our inquiry and sustain the verdict." *State v. Colwell*, 2000 UT 8,¶ 42, 994 P.2d 177.

## ANALYSIS

¶ 18 Martinez argues that the admission of Black's identification of him as the driver of the car seen leaving the scene of the crime violated his due process rights under both the Federal and Utah Constitutions because it was unreliable and induced by an overly suggestive photo spread. Martinez's federal constitutional challenge was not raised in the Motion to Suppress Eyewitness Identification submitted to the trial court. However, the trial court, in making its findings, applied both the federal and state requirements set forth in *Ramirez* and *Long*.[2]

### I. Eyewitness Identification

¶ 19 In *Ramirez*, the Utah Supreme Court extended its recognition that eyewitness testimony is both potent and yet fallible; thereby requiring the trial court, in instances where eyewitness identification is central to the case, to undertake "an in-depth appraisal of the identification's reliability," before admitting such testimony under Article I, Sec-

---

**2.** Because, as Martinez concedes in his brief, the federal and state requirements "vary slightly," we do not apply the two tests individually. Martinez has provided little analysis and legal authority in support of his contention without citation to the record.

> In *State v. Ramirez*, [817 P.2d 774 (Utah 1991)], the Utah Supreme Court determined that the due process analysis under Article 1, Section 7 of the Utah Constitution for determining the reliability of eyewitness identifications "is certainly as stringent as, if not more stringent than, the federal analysis." Therefore, we, like the supreme court in *Ramirez*, do not undertake a separate analysis under the Fourteenth Amendment of the United States Constitution. We note, however, our conclusion would be no different under a Fourteenth Amendment analysis.

*State v. Perry*, 899 P.2d 1232, 1236 (Utah Ct.App. 1995).

Therefore, we choose not to address the federal provision separately and limit our analysis to the state constitutional requirements. In so doing, we apply the requirements set forth in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), which incorporate the federal test as well as an additional factor. "Based on federal case law and the Utah Supreme Court's decision in *State v. Long*, 721 P.2d 483, 493 (Utah 1986), the *Ramirez* court established a separate, more in-depth due process analysis of the reliability of eyewitness identifications under the Utah Constitution." *State v. Nelson*, 950 P.2d 940, 943 (Utah Ct.App.1997). If, after applying the five factors set forth in *Ramirez*, the identification is found to be reliable, "then it is admissible under the Due Process Clause of the Utah Constitution." *Id.*

tion 7 of the Utah Constitution. 817 P.2d at 780. Noting that "[t]he ultimate question to be determined is whether, under the totality of the circumstances, the identification was reliable," the court listed the following pertinent factors for determining reliability:

(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's.

*Ramirez,* 817 P.2d at 781 (quoting *State v. Long,* 721 P.2d 483, 493 (Utah 1986)) (alteration in original).

¶ 20 Martinez argues that application of the five *Ramirez* factors shows Black's identification of him was constitutionally unreliable. Specifically, Martinez argues Black's identification should have been suppressed because at the time of the incident, she was focused on her children's safety, her observation lasted only a few seconds, and the presentation of the photo spread by Officer Yoshikawa was suggestive. The task before us is to "review the record evidence and determine from the totality of the circumstances whether the admission of the identification is consistent with the due process guarantees of article I, section 7." *Ramirez,* 817 P.2d at 781.

### A. Witness's Opportunity to Observe Defendant

■ ¶ 21 The first *Ramirez* factor relates to the witness's opportunity to view the defendant. *See Ramirez,* 817 P.2d at 782. Examination of this factor includes considering "the length of time the witness viewed the actor; the distance between the witness and actor; [and] whether the witness could view the actor's face." *Id.* In addition, the quality of light and presence of distractions are also considered. *See id.*

■ ¶ 22 Detailed written findings concerning Black's observations were made. The trial court found that at approximately 3:30 p.m. on August 3, 1999, Black, who was picking up her children, was standing in front of her babysitter's home on Dale Avenue when she saw two men running up the street. At this time she also saw an older, two-toned, green American automobile turn onto Dale Avenue and proceed up the street towards her. As the car slowed down to allow two men to enter, Black made eye contact with the driver for between ten and fifteen seconds. The driver's side window of the automobile was down and nothing obstructed her view of the driver. The trial court's findings, supported by the record, show that Black had ample opportunity to view Martinez in favorable conditions.

### B. Witness's Degree of Attention

¶ 23 The second reliability factor requires the court to examine the witness's degree of attention to the defendant, by looking at whether the witness was fully aware of what was taking place. *See id.* at 783. With respect to this factor, the trial court found that Black's attention was aroused because she thought it unusual that one of the men was wearing a hooded sweatshirt on such a hot day, and that she initially thought there might be a shooting because both of the men and the car were moving hastily together. As the two men entered the automobile, Black lost eye contact with the driver for about a second, but immediately regained it after the two men entered the automobile. Eye contact was maintained with the driver for about ten to fifteen seconds, until the car turned onto another street. The record supports the court's findings that Black's attention was focused on the developing action and particularly on the driver's face.

### C. The Physical and Mental Capacities of the Witness

■ ¶ 24 The third reliability factor focuses on the physical and mental capacities of

the witness. *See id.* "Here the relevant circumstances include whether the witness's capacity to observe was impaired by stress or fright at the time of the observation, by personal motivations, biases, or prejudices, by uncorrected visual defects, or by fatigue, injury, drugs, or alcohol." *Id.*

¶ 25 The court found that because the two men and the automobile were proceeding hastily in the same direction, Black initially thought a shooting might occur. The record clarifies the court's intent to show that if Black's capacity to observe the events was compromised because she thought a shooting might occur in the proximity of her children, that impediment was quickly removed. Once her children were safely inside her car, which was before the automobile had even slowed down, Black was able to focus on the approaching automobile and its occupants. In support of the court's findings, Black testified that she did not have trouble seeing at a distance and that she does not wear corrective lenses. In addition, the court noted in its findings that there were no impediments between Black and the driver to block her view and that she was not taking any medications or anything else at that time.

### D. Whether Identification Was a Product of Suggestion

¶ 26 The fourth factor focuses on the genuineness of the identification by determining whether it "was made spontaneously and remained consistent thereafter or whether it was a product of suggestion." *Id.* The circumstances considered involve:

[T]he length of time that passed between witness's observation at the time of the event and the identification of defendant; the witness's mental capacity and state of mind at the time of the identification; the witness's exposure to opinions, descriptions, identifications, or other information from other sources; instances when the witness or other eyewitnesses to the event failed to identify defendant; instances when the witness or other eyewitnesses gave a description of the actor that is inconsistent with defendant; and the cir-

cumstances under which defendant was presented to the witness for identification. *Id.*

¶ 27 Martinez generally challenges the reliability of Black's identification under this factor, but does not attack the consistency of Black's identification. Rather, the only assertion is that the trial court erred in concluding the photo spread was not suggestive. As such, Martinez's claim goes only to the "circumstances under which defendant was presented to the witness for identification." *Id.* Specifically, Martinez claims the photo spread did not include images of Hispanic men between the ages of eighteen and twenty-five, as Black had originally described, but images of Hispanic men in Martinez's age range, who was thirty-four. Therefore, Martinez concludes, the photo spread improperly suggested that the police had a suspect who was in his thirties and thus tainted Black's identification of Martinez.

¶ 28 In *State v. Thamer,* 777 P.2d 432 (Utah 1989), the Utah Supreme Court applied a two part test to determine whether a pre-information photo spread was so suggestive that subsequent admission of the in-court identification violated due process:

First, we must determine whether there was a pretrial photographic identification procedure used which was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Second, if the photo array is impermissibly suggestive, then the in-court identification must be based on an untainted, independent foundation to be reliable. Reliability is, of course, the linchpin of the admissibility of identification evidence.

*Id.* at 435 (citations omitted).

¶ 29 The main question when evaluating the permissibility of a pretrial photo identification is "whether the photo line array emphasized the defendant's photo over the others." *State v. Lopez,* 886 P.2d 1105, 1111 (Utah 1994). Several things should be considered in making this determination, including:

whether the words or body language of the officers who presented the array conveyed

an attitude of disinterest, whether the officers manipulated the photos to indicate their belief that one of the photos portrayed the perpetrator, and whether the photos themselves were selected so that the defendant's photo stood out from the rest.

*Id.* at 1111–12.

¶ 30 In *Lopez,* the defendant claimed the photo spread, which consisted of six pictures, was unconstitutionally suggestive because out of the six photos, only one appeared "marginally Hispanic like Lopez." *Id.* at 1112. The defendant further argued that the witness's description of the perpetrator vacillated and therefore was impermissibly suggestive. *See id.* The Utah Supreme Court rejected these claims and held:

> Although the failure of an officer to match subjects according to ethnicity is usually a strong indication of impermissible suggestiveness, the suspect here was not clearly a member of the Hispanic ethnic group. The key is whether the descriptions of the subjects in the photo array match the description of the suspect.... [I]n this case, matching the subjects by skin tone was sufficient.

*Id.* The court also held the photo array was not impermissibly suggestive because, even though the descriptions of the witnesses were incomplete, they did not "indicate inappropriate behavior on the part of the police, nor [did] they tend to show that one photo in the array stood out from the rest." *Id.*

¶ 31 In the case at hand, the trial court's detailed findings indicate that the photo array, as well as Detective Yoshikawa's presentation of the photo array to Black, correctly followed the guidelines set forth in *Lopez.* The court found that Black initially described the driver as appearing to be an eighteen to twenty-five year old Hispanic male, with dark, shiny skin and white teeth. However, Black indicated that this age range was for the group as a whole and did not specify an age for the driver individually. Before going to Black's home, Detective Yoshikawa telephoned to ask if it was possible the driver might be older than she initially described. Black acknowledged that there was "a very good possibility" that the driver

could be older. Based on this response Detective Yoshikawa prepared a computer generated photo array that included Martinez and five Hispanic males resembling him, whose ages ranged from thirty to thirty-seven.

¶ 32 The court found that on August 5, 1999, Detective Yoshikawa went to Black's home with the photo array. Before presenting the array, the Detective informed Black that the men depicted would appear older than the age description she had given to the police, that the driver of the automobile may be included, and that she should take her time as she viewed the entire spread and each individual photograph. The court also found that the Detective did not suggest anyone in the photo spread, that he did not help her make a selection, and that she did not feel compelled to make an identification from the photo spread.

¶ 33 Finally, the court found that although Black was not certain in selecting the photograph of Martinez as the driver of the automobile because the driver's facial skin appeared smoother than that in the photograph, she was struck by the similarities of Martinez and the driver both in the hairline and particularly in the eyes, which did not appear to match each other. The trial court thus correctly concluded that "[t]he manner in which the photo spread was prepared by Detective Yoshikawa and presented to Mrs. Black establishes that it was not unduly suggestive."

E. Nature of Event Being Observed and Likelihood Witness Would Remember and Relate it Correctly

¶ 34 The last reliability factor concerns the nature of the incident observed and the likelihood of it being perceived and remembered correctly by the witness. *See Ramirez,* 817 P.2d at 781. The trial court did not make specific findings on this point, and Martinez failed to raise the same as an issue on appeal.

¶ 35 Based upon the totality of the circumstances underlying the victim's eyewitness identification, the trial court's detailed findings, and consideration of all the circumstances surrounding the identification in light

of the *Ramirez* factors, we conclude that it is reliable and therefore hold that the trial court did not err when it admitted the identification at trial.

## II. Denial of Motion For a Mistrial

¶ 36 Martinez next argues the trial court abused its discretion by denying his motion for a mistrial. "A trial court's denial of a motion for mistrial will not be reversed absent an abuse of discretion." *State v. Widdison*, 2001 UT 60, ¶ 54, 28 P.3d 1278. "This is because the trial court is in the best position to determine whether the incident prejudiced the jury." *Id.* "Therefore, we will not find an abuse of discretion unless 'a review of the record shows that the court's decision is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have a fair trial.' " *Id.* (quoting *State v. Robertson*, 932 P.2d 1219, 1231 (Utah 1997)).

¶ 37 Specifically, Martinez argues the prosecution's failure to disclose a police report led his counsel to ask a witness a question that opened the door for the prosecutor to later elicit damaging testimony. Martinez's brief on appeal contains little analysis and legal authority in support of this contention and no citation to the record. *See* Utah R.App. P. 24(a)(9).

¶ 38 The trial court denied Martinez's Motion for a Mistrial, finding any error in the discovery violation to be minimal, and that this was not enough to "rise[ ] to the mistrial level." The trial court noted that this oversight was out of character for the prosecutor, and because of defense counsel's quick objection any error would be minimal. *See State v. Larson*, 775 P.2d 415, 418 (Utah 1989) ("Rule 16(g) [of the Utah Rules of Criminal Procedure] grants a trial court ample discretion to remedy any prejudice to a party resulting from a breach of the criminal discovery rules."); *see also State v. Stites*, 5 Utah 2d 101, 297 P.2d 227, 229 (Utah 1956) (holding any prejudice remedied when the trial court "promptly excluded" impermissible statements and instructed the jury to disregard those statements). In addition, the trial court offered to present the jury with a curative instruction if the parties desired. *See e.g., State v. Menzies*, 889 P.2d 393, 401 (Utah 1994) (holding discovery violation sufficiently cured when impermissible testimony was stricken and the jury was instructed to ignore it).

¶ 39 We agree that there is no indication that the prosecution intentionally or in bad faith withheld the police report. Further, we perceive no prejudice toward Martinez because of the prosecution's failure to supply the police report. We are not convinced that the trial court abused its discretion in denying Martinez's motion for a mistrial based on this oversight and hold that the prosecutor's oversight did not rise to the level of misconduct. In addition, the effect of the oversight did not undermine the fairness of the trial.

## III. Sufficiency of The Evidence

¶ 40 Martinez challenges the sufficiency of the evidence supporting his conviction for murder and aggravated burglary. The appellate court

"will reverse a jury verdict only when, after viewing the evidence and all inferences drawn therefrom in a light most favorable to the verdict, [the court] find[s] that the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust."

*State v. Heaps*, 2000 UT 5, ¶ 19, 999 P.2d 565 (quoting *Child v. Gonda*, 972 P.2d 425, 433 (Utah 1998)). The burden is on the appellant to "marshal *all* relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous." *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 (Utah Ct.App. 1991). To meet this burden, an appellant "must present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which *supports* the very findings the appellant resists." *Id.* at 1315. After compiling all evidence in support of the verdict, the appellant must then show that there is a flaw in the evidence, sufficient to show that the verdict is clearly erroneous. *See id.*

¶ 41 We first consider whether there was sufficient evidence to convict Martinez of aggravated burglary. Utah Code Ann. § 76–6–202(1) (1999) defines burglary as follows: "A person is guilty of burglary if he enters or remains unlawfully in a building or any portion of a building with intent to commit a felony or theft or commit an assault on any person." *Id.* If, in the course of the burglary, the actor or another participant causes bodily injury to another, the burglary becomes aggravated. *See id.* § 76–6–203. It was undisputed that Martinez did not enter the home and shoot Moya; therefore, in order for the State to convict Martinez of aggravated burglary, it had to satisfy the requirements of the accomplice liability statute. *See id.* § 76–2–202. This allows conviction for aggravated burglary if Martinez, "acting with the mental state required for the commission of [aggravated burglary] ... solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes [aggravated burglary]." *Id.* In other words, the State had to prove that Martinez intentionally aided the two men in entering Moya's home that resulted in the fatal shooting of Moya.

 ¶ 42 Martinez argues there was no reliable or conclusive evidence to support a finding that he acted as a party to the offense. To determine whether the evidence supporting the verdict was "completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust" we must look to the circumstantial evidence and all reasonable inferences drawn therefrom. *Heaps,* 2000 UT 5 at ¶ 19, 999 P.2d 565 (quotations and citations omitted).

¶ 43 The primary evidence on this issue is as follows: Martinez's green Cadillac clearly matched the description of the car given by three witnesses as being the one driven in commission of the murder. After the murder, Martinez attempted to destroy his Cadillac. Martinez claimed that the car had a bad engine, but he had driven the car to the scrap yard, and two months later the engine was in good working order. Black, an eyewitness to the crime, identified Martinez as the driver of the escape vehicle after having unobstructed eye contact with Martinez for ten to fifteen seconds. From a photo array presented two days later, Black identified Martinez as the driver noting his unique eyes that did not seem to match each other. While Martinez was being held at Oxbow jail following his arrest, he confessed to Roger Ashworth, another inmate in the jail, to participation in the offense. Specifically, Martinez admitted he had driven his brother to Moya's house where "all hell broke loose." Although Ashworth's credibility was challenged, the jury was entitled to fully credit his testimony. *See State v. Stewart,* 729 P.2d 610, 612 (Utah 1986) (observing that the jury is free to draw its own inferences and conclusions as to the credibility of a witness).

 ¶ 44 A jury could reasonably infer from this evidence that by driving the two men to Moya's home, dropping them off, waiting nearby, and picking them up when they fled the home, Martinez enabled the two men to enter the Moya home and fatally shoot him. "[I]n light of the evidence supporting the aggravated burglary charge and the reasonable inferences that could be drawn therefrom, a jury could reasonably conclude that [Martinez] intentionally aided [the two men] in entering [Moya's house] and intended ... a felony or assault [to occur] inside the [home]." *State v. Holgate,* 2000 UT 74, ¶ 28, 10 P.3d 346.

¶ 45 Next, we consider whether the evidence was sufficient to sustain a conviction of murder. Pursuant to Utah Code Ann. § 76–5–203(1)(d) (1999) the jury was instructed that in order to convict Martinez of murder they must find from the evidence that he "while in the commission, attempted commission, or immediate flight from the commission or attempted commission of ... aggravated burglary, ... causes the death of another person other than a party." *See id.*

 ¶ 46 "Aggravated burglary is a predicate offense that removes intent as an element of [murder]." *State v. Pierson,* 2000 UT App 274, ¶ 13, 12 P.3d 103. "Thus, as a theoretical matter, ... murder has all the elements of aggravated burglary." *Id.* Because we have determined that the evidence was sufficient to support the jury's finding that Martinez was guilty of aggravated bur-

glary and the death of Moya resulted from this incident, we conclude that the evidence was sufficient to sustain a conviction of murder.

## CONCLUSION

¶ 47 We affirm Martinez's convictions for murder and aggravated burglary. We hold that the trial court properly determined that the eyewitness identification was reliable. We also affirm the trial court's denial of Martinez's motion for mistrial because we are not convinced that the trial court abused its discretion in denying the motion. Finally, we conclude that the evidence was sufficient to support Martinez's convictions for murder and aggravated burglary.

¶ 48 WE CONCUR: NORMAN H. JACKSON, Presiding Judge and JUDITH M. BILLINGS, Associate Presiding Judge.